# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00118-CV

**Angela M. Blackwell, Appellant**

**v.**

**Mark M. Humble, Appellee**

## FROM THE DISTRICT COURT OF MILAM COUNTY, 20TH JUDICIAL DISTRICT NO. 28,167, HONORABLE ED MAGRE, JUDGE PRESIDING

## O P I N I O N

Appellant Angela M. Blackwell appeals from the trial court's judgment limiting her access to her children. Blackwell argues that the trial judge should have recused himself sua sponte, that an assigned judge should have ordered the trial judge's recusal, and that the trial court abused its discretion in limiting her access to the children, allowing the children's grandmother and uncle to intervene, and naming them possessory conservators. We reverse the trial court's judgment in part and remand the cause for further proceedings.

### Background

In October 2002, the trial court signed a final decree granting a divorce to Blackwell and appellee Mark M. Humble and naming them joint managing conservators of their children, Mt., a son born in June 1996, and Md., a daughter born in November 1999. The children's primary place of residence was with Humble, and Blackwell had visitation rights.

In January 2003, Humble filed a motion for enforcement and a motion to modify, asserting that Blackwell had refused to return the children to Humble's care after a visit and had threatened Humble in front of the children. Humble asked that Blackwell be held in contempt for violating the divorce decree and sought orders barring her from speaking to him and requiring her to arrange for a third-party to drop off and pick up the children. A hearing was held on Humble's motion on February 13. On the morning of the hearing, Humble filed a supplemental petition asking the court to suspend visitation pending a mental health evaluation of Blackwell, alleging that Mt.'s grades had dropped recently, that Mt. seemed stressed, and that Blackwell told Md. to say that Betty French, the children's paternal grandmother and Humble's mother, had "choked her and kicked her."

On March 7, the trial court signed an order requiring third-parties for pick-ups and drop-offs, ordering psychological evaluations of both children, and holding Blackwell in contempt, suspending a thirty-day jail sentence if Blackwell complied with the court's orders, paid $3,000 in attorney's fees, refrained from interfering with the psychological evaluations and any recommended treatment, and refrained from communicating with Humble except through the parties' attorneys.

On March 10, Humble filed an "amended supplemental" petition, describing more troubling behavior by the children following visits with Blackwell. Humble alleged that the children acted wild and uncontrollable after an extended visit with Blackwell and that Mt. was exhibiting behavior similar to Blackwell's older son, who was placed in an in-patient psychiatric facility when he was six years old but returned to normal behavior after he was removed from Blackwell's care. Humble asserted that the children's troubling behavior diminished when they were away from Blackwell for prolonged periods of time. Humble feared Blackwell would place "enormous

2

pressure" on the children when they underwent their psychological evaluations and asked the court to suspend Blackwell's visitation or, alternatively, to order supervised visitations.

On March 21, five days before the hearing on Humble's motion, Blackwell filed a motion to recuse the trial court judge, Ed Magre, because he and Humble had practiced law together in the past. Judge Magre referred the motion to Judge B.B. Schraub, the presiding judge of the Third Administrative Judicial Region, who denied the motion without a hearing on March 25 because the motion was not timely filed and did not allege sufficient grounds for recusal. The March 26 hearing went forward as scheduled, and on April 2, the trial court signed an order limiting Blackwell to two supervised two-hour visits with the children per month and ordering her not to make disparaging remarks about Humble or his family. Because Dr. Frank Pugliese, the psychologist initially selected by the court to evaluate the children, was unavailable, the court ordered that Dr. David Poole evaluate the children within three weeks. The court set a status hearing in ninety days. On May 23, Humble sent a letter to the trial court in which he stated that Dr. Poole's "reports will be done as soon as he gets a bit of additional information." On May 30, the trial court sent Blackwell a letter stating that enclosed with the letter were copies of Dr. Poole's reports; the reports themselves, however, are not included in the record.

On June 19, Blackwell filed a second motion to recuse Judge Magre, stating that he and Humble practiced law together in the past and citing to rule 18b of the rules of civil procedure. Blackwell asserted that Judge Magre should have recused himself on his own motion or on Blackwell's first motion. Judge Magre again referred the motion to Judge Schraub, who assigned it to Judge James Clawson, Jr. Humble filed a response, asserting that the grounds for recusal had

3

been disclosed during the divorce proceeding in October 2002 and that Blackwell had waived her right to seek recusal. Following a hearing, Judge Clawson denied Blackwell's motion to recuse.

In August 2004, Betty French and Monty Humble, Humble's brother, filed a petition in intervention seeking to be named possessory conservators of the children. Blackwell opposed the petition in intervention, arguing that the intervenors lacked standing to intervene. The trial court held a hearing in September 2004 to consider the petition in intervention and to reconsider Blackwell's visitation schedule. Following a hearing in September 2004, the trial court signed a judgment in January 2005, finding that the intervenors had had substantial and continued contact with the children sufficient to warrant standing to intervene under the family code, naming the intervenors as possessory conservators, and continuing to limit Blackwell's visitation with the children to two supervised visits each month. It is from this judgment that Blackwell appeals.

## Recusal

In her first two issues, Blackwell argues that the trial court judge should have recused himself from the case sua sponte. In her third issue, she argues the judge should have recused himself when she filed her motion to recuse on June 19, 2003, and in her fourth issue, she contends that the assigned judge should have granted her June 2003 motion.

Rule 18a of the rules of civil procedure governs the recusal or disqualification of judges. A trial court may raise the issue of recusal on its own motion, *Esquivel v. El Paso Healthcare Sys., Ltd.*, 225 S.W.3d 83, 88 (Tex. App.—El Paso 2005, no pet.), or a party may file a motion at least ten days before the date of trial or a hearing stating grounds for the trial judge's recusal. Tex. R. Civ. P. 18a(a). The judge shall then either recuse himself or refer

the matter to the presiding judge of the administrative judicial district, who should either consider the motion or assign another judge to hear the motion. Tex. R. Civ. P. 18a(c), (d). Grounds for recusal of a trial judge include that "he or a lawyer with whom he previously practiced law has been a material witness" in the case. Tex. R. Civ. P. 18b(2)(c).

We review a trial court's decision on a motion to recuse for an abuse of discretion. *McElwee v. McElwee*, 911 S.W.2d 182, 185 (Tex. App.—Houston [1st Dist.] 1995, writ denied). The erroneous denial of a motion to recuse does not void or nullify the court's later rulings. *In re Union Pac. Res. Co.*, 969 S.W.2d 427, 428 (Tex. 1998). If the grounds for recusal are fully disclosed on the record, a party may waive her right to seek recusal. Tex. R. Civ. P. 18b(5). Without a proper and timely motion to recuse, rule 18a's mandatory provisions are never triggered. *Beard v. Beard*, 49 S.W.3d 40, 51 (Tex. App.—Waco 2001, pet. denied) (quoting *Wright v. Wright*, 867 S.W.2d 807, 811 (Tex. App.—El Paso 1993, writ denied)); *see McElwee*, 911 S.W.2d at 186 ("If a party fails to comply [with rule 18a], he waives his right to complain of a judge's failure to recuse himself.").

Judge Ed Magre presided over the parties' divorce proceeding, signing the decree on October 8, 2002, and exercised continuing jurisdiction over issues related to the children under the family code. *See* Tex. Fam. Code Ann. §§ 155.001-.003 (West 2002). Appellee Humble is a lawyer who has been in practice since 1973 and whose father is a retired trial court judge in Milam County. Humble testified that he and Magre were partners together in two different law firms from 1977 through 1986. They were partners in their own firm for two or three years and then partners with several other attorneys for about seven years; the two had not been in practice together for fifteen

5

or sixteen years. Humble described his departure from his practice with Magre as "unpleasant" and "rather acrimonious" and "thought for about ten years [Magre] was pretty unhappy about it." Humble did not believe Magre would show him any favoritism.

At the October 2002 hearing on the parties' divorce, Blackwell contested whether an agreement between the parties should be enforced and incorporated into the divorce decree, and the issue of Magre's impartiality arose. Blackwell testified that she had signed the agreement under duress, explaining, "I was fearful that Mark [Humble] had already talked to the Judge and that he's already told the Judge about this case and had already made arrangements for this case and that I would be lucky to have supervised visits with my children." She testified, "I had a lot of people come to me and tell me I wouldn't get a fair trial here and that I better get this moved out of Milam County." Later, during arguments about the enforceability of the agreement, Humble's attorney said:

> I must say something about the suggestion about what's going on with the Court and the Court's violation of its duty that she alleges. At that point one must either be quiet about the trial court or file the proper motions to bring it properly . . . but you can't say that a Judge is corrupt and then come and ask for his protection.

Blackwell's attorney, who is board certified in family law and has been licensed since 1986, replied:

> [F]or him to also come in and say that I should have filed a Motion to Recuse, how dare I come in here and try to get justice from this Court is also preposterous. I have absolute faith and confidence in this Court, once this Court gets to hear what the facts are. I don't have to file a Motion to Recuse if I believe this Court can be fair and impartial and I believe so, or else I would have filed something differently.

Blackwell first argues that Judge Magre should have raised the issue sua sponte and recused himself without a motion after he signed the decree because it "became clear at that hearing

that the case would go beyond the issue of enforcing a negotiated settlement" and contends that we should reverse the rulings made after the decree was signed and reinstate the decree's provisions.

We do not agree that Judge Magre was somehow impartial enough to have presided over a June 2002 hearing on temporary orders, the record for which is not before us, the October 2002 hearing, and the subsequent signing of the divorce decree, but not impartial enough to have continued to exercise jurisdiction over the case after the decree was finalized. At the October hearing, the parties disputed whether Blackwell signed the agreement voluntarily or under duress, which she argued was at least in part due to her concerns about a back-room deal between Humble and Judge Magre. Despite those concerns, however, Blackwell's board-certified and experienced attorney stated she did not doubt the judge's ability to be fair and did not want to file a motion to recuse. Even if we were to assume that Judge Magre had an absolute duty to raise the issue of recusal on his own motion, Blackwell stated she did not wish to have the judge recused, and Blackwell has not cited any authority that would require Judge Magre to insist on recusing himself over the parties' wishes. We overrule Blackwell's first two issues.

Turning next to Blackwell's argument that her motion should have been granted and that Judge Magre should have recused himself when she filed the motion, we note that Blackwell's testimony shows she was aware of Humble's relationship with Judge Magre well before the October 2002 hearing. Despite this knowledge, Blackwell did not file a motion to recuse before the decree was signed. Although she testified that she worried that Humble had worked out an agreement with Judge Magre before trial, when Humble raised the issue of the judge's impartiality, Blackwell's attorney stated in no uncertain terms that she did not want to file a motion to recuse and believed

7

Judge Magre would be fair and impartial. Her motion was filed five months later, in late March 2003, one month after the trial court modified its divorce decree and held Blackwell in contempt for violating the decree, and was insufficient under rule 18a because it did not state grounds for recusal. *See* Tex. R. Civ. P. 18a. Nevertheless, Judge Magre referred the motion to Judge Schraub, who denied it, finding it was untimely filed and failed to allege sufficient grounds for recusal.

Three months later, in June 2003, Blackwell filed a second motion, asserting Humble's and Judge Magre's work relationship as grounds for recusal and stating that Judge Magre should have recused himself on his own motion. Judge Magre again referred the motion to Judge Schraub, who assigned Judge Clawson to consider the motion. In July 2003, Judge Clawson held a hearing and considered the language of rule 18b, including its provision stating that parties may waive their rights to seek recusal. He noted his discomfort with the way the rules are written, but concluded, "The structure of the statutes, I think, . . . is such that you have to conclude that the rule contemplates that this can be waived and if you go with that interpretation then it has been waived and I would therefore overrule the Motion to Recuse Judge Magre."

Blackwell's June 2003 motion was filed a year after the first hearing in the case and eight months after the decree was signed. The prior relationship between Humble and Judge Magre was well known and was discussed in October 2002. Thus, the June 2003 motion was untimely. *See* Tex. R. Civ. P. 18a(a), 18b(5); *Beard*, 49 S.W.3d at 51. Further, Blackwell's trial counsel explicitly stated that she did not question Judge Magre's impartiality and did not want to have the judge recused. Having reviewed the reporter's records from the October 2002 and July 2003 hearings, we cannot hold that Judge Clawson abused his discretion in denying Blackwell's motion

to recuse. Likewise, we cannot hold that Judge Magre, who we have held did not abuse his discretion in not recusing himself sua sponte, was legally obligated to recuse himself once Blackwell's untimely motion to recuse was filed. We overrule Blackwell's third and fourth issues on appeal.

### Blackwell's Access to Her Children

On April 2, 2003, the trial court signed an order modifying the provisions governing possession of the children. The court found "that the material allegations contained in [Humble's] Amended Supplemental Petition are true and that the requested modifications are in the best interest of the children"[1] and ordered Blackwell's visitations restricted to supervised two-hour visits on the first and third Wednesdays of each month. In its final judgment, signed January 25, 2005, the trial court continued those same modified provisions. In her fifth issue, Blackwell contends that the trial court abused its discretion in restricting her access to and possession of her children. Blackwell argues that the court abused its discretion by modifying its decree because Humble did not show a change in the parties' circumstances that would justify the modification. *See* Tex. Fam. Code Ann. § 156.101 (West Supp. 2007). She further contends the court abused its discretion in incorporating the modified visitation into its final judgment issued on January 25, 2005.

---

[1] In his "supplemental" petition, Humble set out various allegations related to Blackwell's treatment of the children and the children's behavior following an extended visit with Blackwell. He stated that since his separation from Blackwell, circumstances had materially and substantially changed in that Blackwell was no longer being cooperative with Humble or complying with the trial court's orders. Humble alleged that Blackwell had begun threatening him "with vague revelations about his shortcomings," arbitrarily moving pick-up and drop-off times related to visitation, and "flying in to [sic] a rage about small things."

9

To obtain a modification of a joint managing conservatorship, a party must show (1) a material and substantial change in circumstances and (2) that the change would be in the child's best interest.[2]  *Id.*  We review a trial court's modification of a joint managing conservatorship for an abuse of discretion.[3]  *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.). "The trial court is in the best position to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record," and we will not find an abuse of discretion provided some substantive, probative evidence supports the court's decision.  *Id.*  When applying the abuse-of-discretion standard to a trial court's decision to modify its provisions related to possession and custody of children, we ask first whether the trial court had sufficient information on which to exercise its discretion, applying a traditional sufficiency review, and if so, whether it acted reasonably in the application of its discretion.  *Id.* at 477-78.

## *Factual Summary*

Between February 2003 and September 2004, the trial court held four hearings in which evidence relevant to Humble's motion to modify was introduced.  We have carefully reviewed the transcripts from all of the hearings and will condense the testimony from the various hearings into a brief summary to assist in our review of the trial court's ruling.  Some of the testimony was

---

[2]  The standard for modifying a joint managing conservatorship is less stringent than that applied for modifying a sole managing conservatorship.  *Echols v. Olivarez*, 85 S.W.3d 475, 478 (Tex. App.—Austin 2002, no pet.).

[3]  *See In re J.R.D.*, 169 S.W.3d 740, 746-52 (Tex. App.—Austin 2005, pet. denied) (Puryear, J., concurring) (arguing that standards of review applied to conservatorship issues are inconsistent with constitutional nature of parental rights and arguing that clear-and-convincing standard should be applied).

about the parties' pre-divorce conduct or about Blackwell's three older children, who are not part of this proceeding. We recognize that evidence of pre-divorce conduct is not by itself relevant or admissible to obtain a modification, but such evidence may be offered to corroborate allegations and evidence of similar conduct since the decree. *Hollon v. Rethaber*, 643 S.W.2d 783, 784 (Tex. App.—San Antonio 1982, no writ) (quoting *Wilson v. Elliott*, 73 S.W. 946, 947 (Tex. 1903)).

**1.     *Evidence of pre-divorce conduct or related to Blackwell's older children***

Humble testified that during their marriage, Blackwell told him she had been diagnosed with borderline personality disorder. He also testified that E.B., Blackwell's oldest son, had been diagnosed with oppositional defiant disorder and was a dangerous child and committed to a psychiatric hospital for a month when he was six years old. Humble and another witness testified that once E.B. was placed with his biological father, he turned into "a wonderful child." Humble thought Blackwell's two older daughters were anti-social or sociopathic. Andy and Sondra Andrews, Humble's neighbors, testified about several incidents during the marriage when they saw Blackwell neglect or ignore Mt., who was left to cross a busy road or play on a beach by himself. Blackwell denied being diagnosed with a borderline personality, explaining that during graduate school a classmate diagnosed her with features of borderline personality.

**2.     *Evidence related to post-divorce conduct***

Asked what circumstances had changed since the divorce decree was signed, Humble said, "This continued poisoning of the children." Humble said that Blackwell's negative remarks were very unhealthy for the children. Mt. had asked Humble why he had "run Mama out of the

11

house" or "[i]nto the Street" and told Humble that he could do whatever he wanted to at Blackwell's house. Md. had begun "parroting" things such as, "Your [sic] going to die in sixteen years," and, "I can't smell alcohol, Daddy, but Mama can." When Humble asked why Md. had abruptly decided she disliked one of Humble's friends with whom she had been close, Md. said, "How do I know who I'm supposed to believe, I'm only four?" Humble testified that the children were having bad dreams about Blackwell, that Mt. was unhappy and withdrawn, that Mt.'s grades were declining, and that Mt. had started to show oppositionally defiant behavior similar to that exhibited by E.B. Humble said that after the children returned home after a long visit with Blackwell, their "behaviors were astoundingly bad." He also testified that Blackwell told Md. to lie about being abused by French:

> [Mt.] said [Md.] lied when she said that Nana had choked and kicked her[], he said "That's a lie, because that didn't happen" and [Md.] very promptly said "Daddy, I didn't lie, Mama told me to say that."

After Blackwell's visitations had been limited to two supervised visits a month, Humble testified that Mt.'s mood had improved, he had gained weight and self-confidence, he had improved in his reading ability, and he no longer had discipline issues at school or at home. Humble also said Md. was doing well and was well-adjusted and happy.

After Blackwell reported French's alleged abuse of Md., the police called Child Protective Services to investigate. Caseworker Shannon Soechting interviewed Md., who said that she felt safe at Humble's and French's houses. Mt. told Soechting that French never hit him or Md., French denied the allegations and appeared to Soechting to be truthful, and Soechting ruled out the allegations. French testified that she was a retired registered nurse and was very close with the

12

children. French denied choking or kicking Md. and testified that shortly after the divorce, Md. said, "Mother says you're a stink-head." Don Humble, Humble's father and French's ex-husband, testified that while he was caring for the children recently, Md. said, "I hate Nana [French]. Nana hurts me." She then turned to him and said, "I don't like you, you hit me." Don told her she knew that was not true, and Md. "started giggling about it," as if it were a joke.

Darnesha McGregor, who babysat for the children, never saw Blackwell hurt the children or fight with Humble, but testified that Blackwell told her that Blackwell told Md. that "Grandmama [French] is mean and she hit you." McGregor further testified that since the divorce, Blackwell said negative things about Humble in front of the children. Andy Andrews, who was the former principal of Mt.'s school, testified that Mt. became "very withdrawn" after the divorce and that Mt.'s teacher thought Mt. needed "some help, some intervention, possibly some counseling."

Blackwell testified that she married Kendall Hightower in June 2003. Although she filed for divorce in June 2004, the divorce proceeding was on hold while she and Hightower tried to work out their marriage. Blackwell testified that Hightower is bipolar and has mood swings, which are moderated by medication, but when he stops taking his medication, he becomes very erratic. Asked whether it was safe to allow Hightower around the children, she said, "I don't know—you know, when these incidents occurred, I don't know if he was on his medication. . . . When he's on his medication, I don't know that there's a problem." Blackwell said that if the court ordered her not to allow Hightower around Mt. and Md., she would comply and that Hightower had never been violent toward her or her children. The trial court admitted into evidence a number of email communications from Hightower to various people, including Blackwell, Humble, and

Humble's attorney. Many of the emails were violent and threatening in tone, and Hightower threatened to hunt down several men he thought were behaving inappropriately toward Blackwell and threatened to kill one man in particular. In other emails, however, Hightower said he would never harm anyone and that he was in control of himself. Blackwell testified that many of the threatening statements were made while Hightower was off his medication.

Blackwell believed French had hit, choked, and kicked Md. and said that French had beaten and choked Humble when he was a child. Blackwell's oldest child testified that she had never seen violence between her mother and Hightower and that she did not think Mt. and Md. would be in danger if Blackwell had more visitation. One of Blackwell's coworkers and one of her friends testified that Blackwell was a good, attentive parent and that they never saw inappropriate behavior or heard her disparage Humble in front of the children.

Psychologist Charles Pierce testified about borderline personality disorder and its symptoms in general and said that a parent with the disorder would cycle between affection and anger or neglect, which would confuse and harm a child. Dr. Pierce also reviewed Hightower's medical records, which showed that Hightower stopped taking his medications because he believed he was well, he could not afford them, he did not like the sexual dysfunction they caused, and "his wife had asked him to stop taking the medications because of the sexual dysfunction." Pierce noted Hightower's paranoid delusions and homicidal threats and said Hightower "would be dangerous around anyone who set off that mood in that kind of condition." Dr. Pierce did not treat or examine the children, and although the record reflects that Dr. Poole evaluated the children and produced reports for the trial court and the parties, his reports are not contained in the record, mentioned by

the parties in any hearings, or referenced by the trial court's later orders. Indeed, the record does not reflect whether the trial court read or considered the reports in reaching its decisions.

### *Change of Circumstances*

We ask first whether the trial court had substantive and probative evidence on which to base its decision that the parties' circumstances had changed so as to justify a modification of the conservatorship provisions. *See Echols*, 85 S.W.3d at 477-78. Although several witnesses testified that Blackwell was a good, attentive mother who never abused her children, there was also testimony that since the divorce, she had neglected the children and disparaged Humble and his family in their presence, which confused and depressed the children. *See In re Marriage of Chandler*, 914 S.W.2d 252, 254 (Tex. App.—Amarillo 1996, no writ) (poisoning child's mind against parent can be grounds for modification). Further, she had married a man who is bipolar and who made violent threats toward her and people he perceived were interfering with their relationship. *See In re C.Q.T.M.*, 25 S.W.3d 730, 734 (Tex. App.—Waco 2000, pet. denied) (remarriage and step-parent's conduct and abilities may be considered in modification proceeding). There was evidence that since the divorce, the children's behavior, school performance, and moods had suffered and that both children exhibited behavior showing that Blackwell had manipulated them into saying bad things about Humble and his mother. The trial court as fact-finder was obligated to consider all the evidence and resolve any evidentiary conflicts. *See Lilley v. Lilley*, 43 S.W.3d 703, 705 (Tex. App.—Austin 2001, no pet.). The trial court did not abuse its discretion in determining that there was evidence from which it could conclude that the circumstances had changed and that a modification would be in the children's best interests. *See* Tex. Fam. Code Ann. § 156.101. We

15

next consider whether the trial court properly exercised its discretion in determining the restrictions it placed on Blackwell's possession and access.

*Restrictions on Blackwell's Possession*

Blackwell argues on appeal that the restrictions placed on her are "draconian," "usually reserved for mothers who have burned or scalded a child, broke[n] a child's limb, beaten a child, exposed a child to narcotics and dangerous [drugs], sexually abused the child or allowed a boyfriend to do so." She argues that there is no evidence to justify the restrictions, other than the trial court's "simply doing for his ex-partner, whatever the ex-partner asks him to do."

Certainly, there was evidence presented in this case on which the trial court could have determined that the children's best interests would be served by restricting Blackwell's possession and access.[4] However, this record lacks findings that would allow us to determine whether the trial court appropriately exercised its discretion in imposing the severe limits that it chose. Therefore, we must reverse the portion of the judgment that denies Blackwell's possession and limits her access to two supervised visits a month and remand the case for further proceedings.

It is left to a trial court's discretion to establish the terms and conditions of conservatorship. *In re L.M.M.*, No. 03-04-00452-CV, 2005 Tex. App. LEXIS 7191, at *28-29 (Tex.

---

[4] We bear in mind the distinction between possession and access. *See In re L.L.M.*, No. 03-04-00452-CV, 2005 Tex. App. LEXIS 7191, at *34 (Tex. App.—Austin Aug. 31, 2005, no pet.) (mem. op.) (access allows conservator to visit and communicate with child; possession allows conservator to exercise control over child to exclusion of others); *see also* Tex. Fam. Code Ann. § 153.135 (West 2002) ("Joint managing conservatorship does not require the award of equal or nearly equal periods of physical possession of and access to the child to each of the joint conservators.").

App.—Austin Aug. 31, 2005, no pet.) (mem. op.).  The trial court has the authority to determine frequency and duration of visits and to place any necessary limitations and safeguards on visitations. *Id.* at *29.  The child's best interest is the primary consideration in deciding to limit a parent's possession of and access to her child, *Ditraglia v. Romano*, 33 S.W.3d 886, 889 (Tex. App.—Austin 2000, no pet.), and the family code expresses a strong presumption that it is generally in a child's best interest to have significant contact with both parents.[5]  *See* Tex. Fam. Code Ann. § 153.131 (West 2002), § 153.137 (West Supp. 2007).  Absent a finding of family violence, a trial court considering an original proceeding concerning conservatorship should appoint both parents as joint managing conservators unless the court finds such appointment "would significantly impair the child's physical health or emotional development." *Id.* § 153.131; *see In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000) (chapters 153 (governing original proceedings) and 156 (governing modification proceedings) are "distinct statutory schemes that involve different issues" and impose different standards and burdens of proof, and chapter 153 presumptions are not carried over into chapter 156).

Chapter 153, which governs original custody proceedings, provides that a trial court is to be guided by a presumption that the standard possession order provides the "minimum amount of time for possession of a child by a parent named as a joint managing conservator," Tex. Fam. Code Ann. § 153.137, although the court is not required to order standard possession.  As we discussed in *In re L.M.M.*, if the court decides in a modification proceeding that standard

---

[5] The natural right between parents and children is of constitutional dimension.  *See Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976).  Blackwell raises a constitutional argument on appeal but did not raise it before the trial court.  Therefore, we will not address it.  *See* Tex. R. App. P. 33.1; *Carrizales v. Tex. Dep't Protective & Regulatory Servs.*, 5 S.W.3d 922, 925 (Tex. App.—Austin 1999, pet. denied) (constitutional challenge not raised in trial court is waived on appeal).

possession is not in the child's best interest, it may deny possession and access or craft an order placing restrictions on possession or access that will eliminate the danger posed to the child's physical or emotional well-being. 2005 Tex. App. LEXIS 7191, at *29 (quoting *In re Walters*, 39 S.W.3d 280, 286 (Tex. App.—Texarkana 2001, no pet.)). A court may not, however, deny a conservator's rights of possession and access absent a finding that possession and access would endanger the child's welfare, and "any limitations on such rights cannot exceed that [sic] required to protect the child's best interest." *Id*. at *29-30.

Under the trial court's modified judgment, Blackwell retains limited rights of access to Mt. and Md., but she has been denied possession. *See id*. at *34. Although we recognize that the trial court did not altogether deny Blackwell's right to access to the children, which we would scrutinize closely to be sure was supported by "extreme grounds," *see Allison v. Allison*, 660 S.W.2d 134, 137 (Tex. App.—San Antonio 1983, no writ), the severe limits placed on her contact with her children still require our careful review.

The trial court did not make and Blackwell did not request findings of fact, which generally results in our making implied findings supported by the record.[6] *See Niskar v. Niskar*, 136 S.W.3d 749, 753 (Tex. App.—Dallas 2004, no pet.). However, by continuing Blackwell's

---

[6] We recognize that section 156.101 of the family code does not specifically require a trial court to make written findings of best interest in a modification proceeding. Tex. Fam. Code Ann. § 156.101 (West Supp. 2007). However, section 156.101 bars a trial court from modifying a custody order unless the modification is in the child's best interest. *Id*. Based on our review of the record and without more explicit findings and explanation by the trial court, we do not believe we can properly evaluate the modification and restrictions the court placed on Blackwell's contact with her children in light of the court's finding that it was in the children's best interest for Blackwell to remain a joint managing conservator.

appointment as joint managing conservator in the orders in question here, the trial court impliedly found that her possession of or access to the children would not significantly endanger their physical or emotional welfare. *See* Tex. Fam. Code Ann. § 153.131(a); *Roosth v. Roosth*, 889 S.W.2d 445, 451 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (appointment of party as possessory conservator showed implied finding that party's "possession or access to the children would *not* endanger the physical or emotional welfare of the children"). The trial court's denial of Blackwell's possession and its severe restrictions on her access to the children give rise to implied findings that conflict with those arising from her continued status as a joint managing conservator of the children.[7]

There was sufficient evidence to support the trial court's decision that some limitations on Blackwell's possession and access would be in the children's best interests. However, the duration and severity of the restrictions and the difficulty Blackwell will face in seeking future modifications that might allow her more contact with her children cause us some concern. While the trial court may have believed that the evidence justified the severe restrictions it placed on Blackwell, those restrictions seem inconsistent with the court's decision to maintain her as a managing conservator, and we are left to speculate about what, in fact, it did believe. Because the trial court made no findings of fact and because the implied findings that spring from the court's determinations are in conflict, we are unable to discern what guiding rules and principles the court applied and whether the court appropriately exercised its discretion in denying Blackwell's possession and limiting her access to her children.

---

[7] The temporary order that first limited Blackwell's visitation stated that the trial court found "that the material allegations contained in the Amended Supplemental Petition are true and that the requested modifications are in the best interest of the children."

We recognize that Blackwell did not explicitly raise the issue of best interest in her appellate brief. However, she attacks the modification globally, and in deciding to modify a parent's contact with her children, the children's best interests must always be the trial court's primary concern. *See* Tex. Fam. Code Ann. § 156.101 (modification of existing conservatorship order); *see also L.M.M.*, 2005 Tex. App. LEXIS 7191, at *29 (court may limit possession and access if standard possession would endanger child's best interest). We share the dissent's concerns and agree that, generally, we should defer to the trial court's judgment in reviewing modification orders. However, because the trial court imposed strict restrictions on Blackwell's contact with her children, which we must consider carefully, we cannot ignore the issue of best interest and cannot ignore the fact that, without some explanation, the trial court's orders would seem to be based on conflicting best interest findings. Under these circumstances and given the passage of time since the trial court restricted Blackwell's contact with the children, we believe that remand, which will allow the trial court to consider the parties' circumstances anew, as well as additional testimony and any available evidence about the children's psychological conditions, is the best solution. Remand will give the court the opportunity to resolve some of the conflicts that we have discussed and to ensure that the restrictions placed on Blackwell are indeed in the children's best interests and do not exceed those required to protect the children. *See L.M.M.*, 2005 Tex. App. LEXIS 7191, at *29-30. We therefore reverse the portion of the judgment restricting Blackwell's visitation and remand the case to the trial court for further proceedings consistent with this opinion. *See Hopkins v. Hopkins*, 853 S.W.2d 134, 138-39 (Tex. App.—Corpus Christi 1993, no writ) ("As the trial court's findings are contradictory, . . . we remand the case to the trial court so that it may determine whether appellant's access to the

20

children is in the children's best interest, and if so, what limitations to appellant's rights as possessory conservator are in the children's best interest.").

## Intervenors

In her sixth and final issue, Blackwell complains that the trial court abused its discretion in allowing the children's grandmother and uncle to intervene and in appointing them as possessory conservators of the children.

A non-parent may not file an original suit seeking to be named possessory conservator, but a grandparent or other person who the trial court finds has had substantial past contact with a child may be granted leave to intervene in a pending suit concerning child custody. Tex. Fam. Code Ann. § 102.004(b) (West Supp. 2007).[8] We review a trial court's decision to allow a petition in intervention for an abuse of discretion. *McCord v. Watts*, 777 S.W.2d 809, 812 (Tex. App.—Austin 1989, no writ).

When French was asked about her petition in intervention, she said she wanted to have defined legal rights to the children. Asked whether she was having trouble seeing the children and what the purpose of her petition was, she answered that she was able to see the children and

---

[8] In 2005, the legislature amended section 102.004 to add a further condition on someone seeking to intervene and seek possessory conservatorship. Under the amended statute, a grandparent or a person with significant past contact may intervene in a pending suit only if there is "satisfactory proof . . . that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair" the child. *See* Act of May 29, 2005, 79th Leg., R.S., ch. 916, § 3, 2005 Tex. Gen. Laws 3148, 3149 (effective June 18, 2005, current version at Tex. Fam. Code Ann. § 102.004(b) (West Supp. 2007)). These proceedings were underway before the amended statute's effective date, thus, we apply the version in effect at the time. *Id*. at 3155, § 25. Because the language referenced above was not changed by the amendment, we cite to the current version. *See* Act of Apr. 6, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 125.

wanted to see them have healthy development. She agreed when asked whether she would want to raise the children should anything happen to Humble, saying, "I feel like I'm competent and I think that would be in the children's best interest." Monty Humble, Humble's brother, testified that he wanted to have defined legal rights to the children to protect them. He testified that he had "seen them regularly during their lives." He said that the "current purpose" of his petition was to be named co-possessory conservator, not to be named a future managing conservator, but that he "want[ed] to be available if Mark is unavailable." He testified that "the key issue is whether the children could visit us without Mark present and whether we would be able to take care of them during that time."

We agree with Blackwell that Monty Humble did not show that he had "substantial past contact" with the children. Monty testified only that he had "seen them regularly." Without more, this does not show substantial past contact sufficient to warrant his intervention, especially in this case in which both parents are living and present and there is no testimony that the children are at risk living with Humble. Therefore, based on the meager facts presented with regard to Monty Humble's relationship with the children, we hold that the trial court erred in allowing him to intervene and in appointing him as a possessory conservator. We reverse that portion of the judgment.

As for French, based on the evidence about the post-divorce circumstances, we cannot hold that the trial court abused its discretion in allowing her to intervene. She frequently cared for the children, lived nearby, and spent a great deal of time with the family, and the trial court reasonably could have determined that she showed substantial past contact with the children. We

22

must then consider whether the trial court abused its discretion in naming her possessory conservator.

If a child's managing conservator dies or is incapacitated and the right to possession of the child is not governed by an order, a parent has superior rights of possession over a non-parent. *See In re P.D.M.*, 117 S.W.3d 453, 459-60 (Tex. App.—Fort Worth 2003, pet. denied) (death of managing conservator ends conservatorship order for possession purposes, and if managing conservator parent dies, "someone must take immediate possession of the children, and the possessory conservator parent's right of *immediate* possession is superior to others' rights"); *see also* Tex. Fam. Code Ann. § 157.376 (West 2002). If a court appoints a managing conservator, it "may" appoint one or more possessory conservator as well. Tex. Fam. Code Ann. § 153.006 (West 2002).

Humble testified that he wanted his mother and brother to have legal rights to care for the children in case anything happened to him and that he did not want Blackwell ever to have primary custody over the children. He worried that if Hightower was "fed" an idea about the murder of a prominent man in a small town and then told that Humble was "likely to kill" Hightower, "it doesn't take too much to figure out that A plus B is maybe going to equal C. It's sort of like sending him at me like a Manchurian Candidate or something." Humble essentially argued that he feared Hightower would try to kill or hurt him and that he wanted his mother and brother to be appointed possessory conservators to ensure that someone other than Blackwell would care for the children.

French and Humble testified that French had a close relationship with the children and spent significant amounts of time with them. French, a retired nurse, helped Humble make health-care decisions and sometimes took the children to the doctor. She also babysat and helped

23

care for the children. Further, Humble testified that he feared Hightower could be dangerous if he was led to believe that Humble was a threat. There was testimony about Hightower's mental instability and about how the children suffer when in Blackwell's care for long periods of time.

Blackwell and Humble are both named joint managing conservators and, therefore, the trial court's judgment does not run afoul of section 153.131's presumption that it is in a child's best interest for her parent or parents to be appointed managing conservator. *See* Tex. Fam. Code Ann. § 153.131(b) (West 2002). Because Humble and Blackwell are joint managing conservators, the court had the power to appoint one or more possessory conservators. *See id*. § 153.006. Although this case differs from most cases involving the appointment of non-parent possessory conservators, we cannot hold that the trial court abused its discretion in deciding that it was in the children's best interest to name French as possessory conservator. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (discussing factors to be considered in determining child's best interest); *In re M.A.M.*, 35 S.W.3d 788, 790 (Tex. App.—Beaumont 2001, no pet.) (discussing application of *Holley* factors in conservatorship dispute between potential adoptive parents and maternal grandmother).

Further, in the present circumstances, French's appointment has no practical effect. Should something happen to Humble, the trial court would then have to determine how to best serve the children's best interests in deciding how to allocate their care between Blackwell and Humble, considering the situation presented at that time. Considering the evidence presented by this case, we cannot hold that the trial court abused its discretion in naming French possessory conservator.

## Conclusion

We have held that the trial court did not err by failing to recuse itself sua sponte or upon Blackwell's untimely motion, that the assigned court did not err in denying Blackwell's motion to recuse, and that the trial court did not err in allowing French to intervene and in naming her a possessory conservator. It was error, however, to allow Monty Humble to intervene and seek to be named possessory conservator. Finally, we cannot adequately review the trial court's severe restriction on Blackwell's possession of and access to her children. Therefore, we reverse the portions of the trial court's judgment appointing Monty Humble as possessory conservator and restricting Blackwell's access. We remand the cause to the trial court for further proceedings related to Blackwell's possession of and access to her children.

_____

David Puryear, Justice

Before Justices Patterson, Puryear and Henson;
    Concurring and Dissenting Opinion by Justice Patterson

Affirmed in part; Reversed and Remanded in part

Filed:  December 14, 2007