# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00140-CV

**Kristina M. Gammill, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE DISTRICT COURT OF HAYS COUNTY, 274TH JUDICIAL DISTRICT
### NO. 2006-2110, HONORABLE WILLIAM HENRY, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

Kristina M. Gammill[1] challenges the judgment terminating her parental rights to R. A. She challenges the failure to recuse the associate judge, to grant a continuance, and to find a jury demand timely. Gammill also challenges the trial court's conclusions that Gammill's acts and omissions endangered her son's physical or emotional well-being and that she failed to comply with the provisions of the plan to reunite her with her child. She also contends that the trial court erred by finding that termination of her parental rights was in R. A.'s best interest. She contends that no evidence, or legally and factually insufficient evidence, supports the trial court's termination of her parental rights. We affirm.

---

[1] Appellant's last name is spelled Gammel in some filings and Gammill in others. We use the latter spelling, which was used in the order of termination and the notice of appeal.

R. A. was born October 2, 2006. He is Gammill's second child. His father is Lafay Augustine, who was alleged at trial to have fathered nine children by five women in his 26 years. Within weeks of R. A.'s birth, Gammill left her parents' home[2] and moved to a series of lodgings, one of which the Department deemed acceptable and one of which the Department deemed unsafe. Gammill stopped taking the drugs prescribed to treat her bipolar disorder and, during the next few months, developed postpartum depression, attempted suicide, and was admitted to a psychiatric hospital. On December 20, 2006, the Department filed this proceeding and took custody of R. A.

Gammill partially complied with the requirements of her plan. She attended approximately 25 of her 33 scheduled visits with R. A., and was sometimes late. She was asked to withdraw from parenting classes in May 2007 because of her absences, although she later completed the classes. She failed to maintain employment or stable housing.

She also renewed her relationship with Augustine, by whom she again became pregnant in May 2007. She initially denied that he was the father of the second child. In September, Gammill had a confrontation with Augustine after he damaged the engine in her car. Gammill testified that, after Augustine physically abused her, she ended the relationship. Also in September, the Department changed its direction in this matter to termination rather than reunification.

The case was initially heard by Associate Judge Karin Bonicoro on October 26, 2007. Gammill moved to recuse Judge Bonicoro, asserting that she was biased against Gammill.

_____

[2] There was conflicting evidence on whether she left because she did not feel welcome or was barred from the premises because of parental objections to her taking R. A. to visit Augustine.

Judge Bonicoro declined to withdraw, and the motion was denied. Gammill's jury demand was denied as untimely, and Judge Bonicoro refused to continue the hearing so that Gammill could obtain a jury and call three witnesses—Jim Cox, a forensic psychologist who evaluated Gammill, Daniel Skoglund, her treating psychologist, and Tania Glenn, a social worker who taught Gammill's parenting class. After the hearing, Judge Bonicoro concluded that Gammill's parental rights should be terminated. Gammill appealed for a de novo hearing before the district judge.

On January 29, 2008, the district court took judicial notice of the testimony from the hearing before Judge Bonicoro. The court also heard testimony from Skoglund and additional testimony from Gammill. The court ordered Gammill's rights terminated. After Gammill filed her statement of points on appeal, the district court found her indigent and deemed her appeal frivolous.

By her first point of error, Gammill contests the finding that her appeal is frivolous. The statute governing appeals of parental rights terminations provides that an "appellant may appeal . . . the court's finding that the appeal is frivolous by filing with the appellate court the reporter's record and clerk's record of the hearing held under this section, both of which shall be provided without advance payment, *not later than the 10th day after the date the court makes the decision*." Tex. Civ. Prac. & Rem. Code Ann. § 263.405(g) (West 2008). The trial court found this appeal frivolous no later than May 22, 2008. The Department—not Gammill—requested on June 24, 2008, that the clerk file a supplemental record containing the order with the frivolousness finding. It was filed with this Court on June 30, 2008.[3] The reporter's record of the hearing at which the court made

---

[3] Other parts of the record were requested and filed separately, including the original clerk's record (February 26, 2008) and the reporter's records of the hearings before the associate judge (May 23, 2008) and the district court (April 16, 2008).

3

the frivolous finding was filed July 21, 2008. Both records were filed well beyond ten days after the court found her appeal frivolous. There is no indication that Gammill requested the record sooner and no complaint about the timing of the filing. Because Gammill did not pursue the appeal of the frivolousness finding timely, we cannot review it.[4]

By her second point of error, Gammill contends that the denial of her motion to recuse Judge Bonicoro was erroneous. Recusal is appropriate when a judge's impartiality might reasonably be questioned or the judge has a personal bias or prejudice concerning the party. Tex. R. Civ. P. 18b(2). We review the denial of a motion to recuse for an abuse of discretion. Tex. R. Civ. P. 18a(f); *Blackwell v. Humble*, 241 S.W.3d 707, 712 (Tex. App.—Austin 2007, no pet.). Gammill argued at trial that Judge Bonicoro should have been recused because she expressed personal bias or prejudice against Gammill, specifically at the September 28, 2007 permanency hearing. Gammill asserts that, at that hearing, "[a]t every turn, scorn and embarrassment of the kind usually reserved for carriers of plague and petulance is showered on Appellant causing her to emotionally break down." Gammill cites Judge Bonicoro's remarks while questioning her regarding her relationship with Augustine, such as asking why she resumed her sexual relationship with him after he had not been participating in R. A.'s life. She also cites the judge's inquiry into her understanding of the

---

[4] Further, it is not clear that our review would have any effect. The records have been filed without indication that Gammill paid for them—indeed, two of the reporter's records recite that they were to be paid by Hays County. She was found indigent and was represented on appeal. She has not paid costs in this Court. Nevertheless, we are considering the merits of her appeal. Because Gammill has not briefed why the frivolousness finding must nevertheless be reversed, we would be in the position of providing an advisory opinion that the appeal is not frivolous even if the error had been timely presented for our review.

4

evaluative aspects of compliance with the service plan intended to facilitate reunion with R. A.[5] She cites the judge's inquiry into psychological testing and steps she had taken to find housing, the latter of which occurred just after R. A.'s attorney and guardian ad litem, the Department's attorney, and Gammill's therapist had all recommended going to trial.[6]

---

[5] Gammill included the following excerpt in her Supplemental Motion to Recuse Judge:

THE COURT: You know, it's possible to do all these services and still fail, do you understand that, Ms. Gammill? Do you understand that that could happen?

MS. GAMMILL: I understand, but I—

THE COURT: Do you know how—can you tell me how that might be the case, why it could be that you could do a bunch of services and still end up not getting your child back?

MS. GAMMILL: Because his father is not a safe person for me to be around and by me allowing him to be around, I would be putting my child in danger.

THE COURT: You are right on target.

MS. GAMMILLL: I do understand that. I understand where they're coming from.

THE COURT: That was an interesting way to put it. That would lead someone like me to infer that you could understand what they're saying and maybe still not perceive that there really is a threat. Only that you can understand that someone is telling you that you ought to be able to perceive it as a threat.

[6] The quoted excerpt included the following:

MS. GAMMILL: Please, I'm trying to make it right. Please, I'm trying.

THE COURT: Ms. Gammill, unfortunately what I have to pay attention to is your children or child and—

MS. GAMMILL: I've spoke to places as far away as Boerne and New Braunfels, Marywood was the only one that I could get in touch with—

5

Appellant's motion to recuse lacked merit. "To require recusal, a judge's bias must be extrajudicial and not based upon in-court rulings." *Grider v. Boston Co.*, 773 S.W.2d 338, 346 (Tex. App.—Dallas 1989, writ denied) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)). Opinions formed by the judge on the basis of facts introduced or events occurring during proceedings do not constitute a basis for a recusal motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. *Ludlow v. DeBerry*, 959 S.W.2d 265, 271 (Tex. App.—Houston [14th Dist.] 1997, no pet.) (citing *Liteky v. United States*, 510 U.S. 540 (1994)). The excerpts from the record show an associate judge who is trying to clarify the facts in a permanency hearing and to ensure that Gammill appreciates the gravity of her acts and omissions. Nothing in the record indicates bias on the part of Judge Bonicoro. These statements occurred a month before the trial, and Gammill does not point to any evidentiary rulings made by Judge Bonicoro that show bias. The district court took notice of the testimony taken at that hearing and ordered termination. We overrule point of error two.

Gammill contends that the trial court erred in not granting her motion for continuance to obtain a jury setting and by finding that her jury demand was untimely. We review the denial of a motion for continuance for an abuse of discretion. *General Motors v. Gayle*, 951 S.W.2d 469, 476

---

THE COURT: You've done that—you've done that the week of this hearing. And it's not unusual as people get—you know, they don't—they don't do these kinds of things for three months that precede, but they get right up to the hearing and they kick into action because they need to be able to come in here and show me something.

But you're also a solid eight months into this case. And a week ago you tell everybody you let this guy beat the crap out of you while you're pregnant. The same guy that got us here the first time around, I think.

6

(Tex. 1997) (orig. proceeding). Jury trials are available in family law cases upon timely request. *See* Tex. Fam. Code Ann. § 105.002 (West 2008). By rule, the request must be made and the jury fee paid at least 30 days before the trial date. Tex. R. Civ. P. 216. "When a party has perfected its right to a jury trial in accordance with Rule 216 but the trial court proceeds to trial without a jury, the party must, to preserve error, either object on the record to the trial court's action or indicate affirmatively in the record it intends to stand on its perfected right to a jury trial." *In re K.M.H.*, 181 S.W.3d 1, 8 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Neither the associate judge nor the district judge abused their discretion by denying the jury demand or the motion for continuance. Gammill's jury demand was untimely under the general rule and the specific order in this case. The Pre-Trial Scheduling Order, signed February 16, 2007, provided in bold, italicized, and underlined language: "All jury demands are to be filed on or before the date of the Initial Permanency Hearing." The initial permanency hearing was set for June 8, 2007, and held on June 22, 2007. A subsequent permanency hearing was held on September 28, 2007. Gammill filed her jury demand on October 9, 2007.[7] Gammill contends that the jury demand was necessitated by the Department's change of requested relief from reunification to termination, but the scheduling order does not have alternate timetables depending on the course of the proceeding. A continuance might have pushed the initial hearing date beyond 30 days after the October 9 jury demand, but it would not have made the October 9 filing compliant with the June 22 deadline. Gammill did not file a new jury demand before the de novo hearing, nor did she object to the absence of a jury at that hearing.

---

[7] Even solely under Rule 216, this was untimely for the hearing before the associate judge.

Gammill also argues that the associate judge abused her discretion by denying the continuance on grounds that it prevented her from calling certain witnesses. Without exploring whether Judge Bonicoro erred, we conclude that any asserted error was rendered moot by the de novo hearing before the district court. We are reviewing the judgment rendered by the district court. Any error in denying the continuance was harmless, because Gammill had the opportunity to call the disputed witnesses to testify before the district court. She called Dr. Skoglund (mooting her complaint) and did not call the other witnesses (waiving her complaint). There is no showing that Judge Bonicoro's denial of the continuance prevented Gammill from calling any witness before the district court. We overrule points of error three and four.

Gammill's remaining points of error challenge the sufficiency of the evidence and the findings made in support of the judgment. She contends that the court erred by finding that she (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child, (2) engaged in conduct that endangers the physical or emotional well-being of the child, and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for Gammill to obtain the return of the child who had been in the permanent or temporary managing conservatorship of the Department. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O) (West 2008). She also contends that the court erred by finding that termination of the parent-child relationship was in the child's best interest. *See id*. Gammill asserts that termination of the parent-child relationship was supported by no evidence, legally insufficient evidence, or factually insufficient evidence.

8

A court may terminate the parent-child relationship only if it finds clear and convincing evidence to support one or more of the statutory grounds and that termination would serve the child's best interest. *Id.* Appellate courts review the factual and legal sufficiency of the trial court's findings of fact and conclusions of law according to the same standards as jury findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *GATX Terminals Corp. v. Rylander*, 78 S.W.3d 630, 633 (Tex. App.—Austin 2002, no pet.). Witness credibility issues "that depend on appearance and demeanor cannot be weighed by the appellate court; the witnesses are not present. And even when credibility issues are reflected in the written transcript, the appellate court must defer to the jury's determinations, at least so long as those determinations are not themselves unreasonable." *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004).

In a factual sufficiency review of a finding subject to a clear-and-convincing standard of proof, "a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The inquiry is whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the disputed finding. *Id.* "A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

If a party is attacking the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, the attacking party must demonstrate on appeal that there is no evidence to support the adverse finding. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Beard Family P'ship v. Commercial Indem. Ins. Co.*, 116 S.W.3d 839, 847 (Tex. App.—Austin 2003, no pet.). In conducting a legal sufficiency review in a parental rights termination case, we must consider all of the evidence, not just that which favors the verdict. *In the Interest of J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). That opinion relied on the following passage from *J. F. C.*:

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

*J.F.C.*, 96 S.W.3d at 266.

Evidence supporting a finding that Gammill (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child, or (2) engaged in conduct that endangers the physical or emotional well-being of the child include the following:

- Gammill had history with substance abuse, bipolar disorder, and the Department that echoed through this case. She began using alcohol and marijuana when she

10

was 12 years old, and moved onto methamphetamines and cocaine at around 16. She reported physical and verbal abuse by her father starting when she was age 12. The Department found reason to believe that Gammill's father had sexually abused his niece. Gammill was in Department care from age 13 until age 18.

- Gammill had a child who was the subject of a removal and service plan in Bastrop County when she had R. A. The child was eventually placed with Gammill's parents.

- Gammill stopped taking the medications treating her bipolar disorder shortly before R. A. was born, and did not resume taking them until hospitalized following her suicide attempt. In addition, Gammill suffered from postpartum depression after R. A.'s birth.

- Within days of R. A.'s birth in October 2006, Gammill left her parents' house, and she moved four times in just over two months. Although she had, with a Department representative, created a safety plan that called for her to stay with an aunt, she soon left that home for one described by Department investigator Constance Rentz as trash-filled, containing many safety and health hazards inside and outside, and occupied by persons believed to be using marijuana and intravenous drugs.

- When R. A. was younger than two months, Gammill reportedly took him with her to bars and left him in the care of individuals whom she did not know very well. She resumed using drugs and alcohol in December 2006 and January 2007.

- In December 2006, Gammill took an overdose of Excedrin and was treated and released the same day. She testified that she attempted suicide twice in 2007. She later checked into a psychiatric hospital.

- Although Augustine was in jail in November 2006, occasionally denied fatherhood of R. A., and failed to participate in services designed to restore custody to Gammill and himself, Gammill renewed or continued her relationship with him, including conceiving a second child with him. She made that contact despite being warned against it by the Department, which had twice found reason to believe that Augustine was violent toward the mother of some of his other children. That contact continued through September 2007, when he beat Gammill during an argument while she was four months pregnant with his child.

- Gammill proposed to stay in a house on her parents' land, returning to the site where she claimed her father was verbally and physically abusive to her and from which she had fled as a teenager and again as R. A.'s mother.

11

- She acknowledged that postpartum depression could again combine with her bipolar disorder based on her experience with R. A.

Evidence not supporting the findings includes the following:

- Gammill's visits with R. A. went well. She interacted with him, changed his diapers, and fed him.

- Her psychiatrist testified that Gammill had resumed her medications for bipolar disorder, had stopped using "stimulants" in January 2007, and was sincere in wanting to improve. He testified that nothing he had observed in 2007 would prevent her from demonstrating an ability to parent.

- Gammill testified at the January 2008 de novo hearing that she had completed parenting classes, completed and was discharged from drug and alcohol testing, and had acquired stable transportation.

- Gammill's parents were named managing conservators of Gammill's eldest child by the Bastrop County court.

- Gammill's parents had remodeled the house she proposed to live in.

- Gammill testified that she ended her relationship with Augustine after he beat her in September 2007.

There were some direct evidentiary conflicts, such as the Department investigator's testimony that Gammill reported ongoing physical abuse by her father since she was twelve versus Gammill's testimony that her father pushed her once just to get away from her. Such conflicts required the fact-finder to make a credibility choice. Although there is evidence that Gammill took steps to improve her parenting abilities and the environment into which she proposed to bring R. A., the fact-finders were entitled to focus on the fact that, when she had custody of R. A. during his first two months of life, she moved him from a relative's home approved by the Department to a

12

home that was unsafe because of its maintenance and because of the drug use of other inhabitants, took him to bars, and left him in the care of unrelated persons whom she did not know very well. She continued to have contact with Augustine—despite her being warned by the Department to stay away, despite her knowing his previous violence toward another mother of his children,[8] and despite his indifference toward R. A.—even conceiving another child with Augustine. We conclude that the record contains legally and factually sufficient evidence to support findings by clear and convincing evidence that Gammill knowingly placed or knowingly allowed R. A. to remain in conditions or surroundings that endangered his physical or emotional well-being, and engaged in conduct that endangered his physical or emotional well-being.

Sufficient evidence also supports the finding that Gammill failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the child who had been in the permanent or temporary managing conservatorship of the Department. It is undisputed that she missed at least 8 of the 33 ninety-minute weekly visits with R. A., and was as much as 45 minutes late for others. She was dismissed from a parenting class because of absences, although she later completed another class after the hearing before the associate judge but before the de novo hearing. She stopped therapy with the Department-provided therapist because she did not trust her, but was not able to regularly attend therapy with her therapist of choice because she could not pay for the sessions. She did not provide a list of medications to her caseworker or the associate judge and, although she testified at the de novo hearing that she had

_____

[8] At trial, Gammill testified that she understood that Augustine had been assaulted by the other mother, rather than him assaulting her.

13

brought proof that she had filled the required prescriptions, she testified that her evidence was deemed inadmissible. She stated that she had been attending Alcoholics Anonymous weekly and had been progressing, although she did not bring proof of attendance because "that's something you do for probation." She failed to maintain stable housing and transportation throughout the year, including when Augustine blew out the engine of her car. She testified at the de novo hearing that she had a car and the remodeled house on her parents' land. Although there was evidence that Gammill's compliance improved during the course of the year this case was pending, the record contains legally and factually sufficient evidence to satisfy the clear-and-convincing burden of proof that Gammill did not fully comply with the court-ordered service plan.

The best interest of the child is often assessed using a nonexclusive list of factors set out by the supreme court. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). Evidence need not establish the existence of every factor to support a finding that termination is in the best interest of the children. *In re C. H.*, 89 S.W.3d 17, 27 (Tex. 2002). However, the presence of scant evidence relevant to each *Holley* factor will not support such a finding. *Id*. Assessing the evidence against the *Holley* factors, we note the following:

(1)    The desires of the child. One-year-old R. A. was described as having bonded with his foster mother, who intended to adopt him. However, Gammill's interactions with R. A. during her visits were described as having gone "very well."

(2)    The emotional and physical needs of the child now and in the future. Gammill moved lodgings several times, including to unsafe surroundings, in his first two months. She missed at least eight of her scheduled visits with him, and was late to others. On the other hand, even while in the unsafe and unkempt home, R. A. was described as clean.

14

(3)     The emotional and physical danger to the child now and in the future. Gammill moved R. A. to a house where illegal drug use was suspected and left him in the care of unfamiliar persons while she went to bars. She renewed or maintained her relationship with Augustine despite being warned to stay away from him by her father and Department employees, and knowing he had physically abused another mother of his children. She did not use the de-escalation techniques she had learned in parenting class. She intended to stay near her parents, despite the facts that she had reported that her father had been physically and emotionally abusive to her for years and that she had fled or been kicked out of their house shortly after R. A. was born.

On the other hand, Gammill denied that her father was violent toward her and stated that she ended her relationship with Augustine after he beat her. She said she had not been aware of battered spouse syndrome, and wanted to get help to deal with that. She also had completed parenting training.

(4)     The parental abilities of the individuals seeking custody. Gammill admitted at the hearing before the associate judge that she was not ready to be R. A.'s full-time parent, in part because she needed more therapy. At the de novo hearing, she admitted that she stopped therapy because she could not pay, and yet she refused therapy with Department therapists because she did not trust them.

Gammill completed her parenting classes and was willing to take more training. Although her psychiatrist said he could not give a good, informed decision about her ability to make daily parenting decision, he testified that she was sincere about wanting to improve, and had been more stable and making better decisions since taking her medications regularly and becoming pregnant again.

(5)     The programs available to assist these individuals to promote the best interest of the child. Programs were available to help Gammill, and she eventually participated in those prescribed, but the fact that she was dropped from a parenting class for absences and her sporadic attendance of therapy cast some doubt on whether she would meaningfully avail herself of such programs. Gammill struggled to complete some of the programs even though they were required by the order in this case as well as a separate case involving her first child. These struggles cast some doubt on her resolve to improve as described by her psychiatrist.

(6)     The plans for the child by these individuals or by the agency seeking custody. R. A.'s foster parents intend to adopt him. Gammill intends to move in next to her parents.

(7)     The stability of the home or proposed placement. Department conservatorship caseworker Aracelia Ruppert described R. A. as very bonded and happy with his foster parents.

Gammill intended to move to the home she left when R. A. was less than a month old. Department workers said she told them her father had been verbally and physically abusive for years. The Department had previously found reason to believe he sexually abused his niece. When Gammill left her parents' house, she moved three times in less than two months. This evidence likely outweighed evidence of Gammill's reported improvement and intent to continue improving. Gammill intended to move in next to her parents, who are the managing conservators of her first child, and was expected to deliver her third child—her second by Augustine—within weeks of the de novo hearing.

(8)     The acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one. Gammill's activities during the first two months of R. A.'s life come to bear here. The repeated moves, including most critically the move away from an approved home to an unsafe house inhabited by suspected drug users, weighs against Gammill on this issue, as does the report that she left him with unrelated, unfamiliar people while she went out to bars. Descriptions of her interacting appropriately during her ninety-minute scheduled visits do not do much to counter that negative impression. After hearing and reviewing testimony, the trial court was positioned to assess whether her efforts to improve herself and her surroundings would persist, or whether she would relapse into her previous behaviors.

(9)     Any excuse for the acts or omissions of the parent. Gammill's history with the Department explains some of her resistance to the Department's and the court's requirements, but that very experience should also have taught her the seriousness of those requirements. That experience does not excuse her acts and omissions to comply promptly with the requirements. Her bipolar disorder and postpartum depression explain some of her actions. Her psychiatrist testified that she was much more stable and improved while on her medications. He testified, however, that her continuation of the relationship with Augustine was not attributable to her psychiatric condition. Gammill testified that she consciously chose to continue the relationship with Augustine so that she could develop a reason to hate him. Her financial circumstances explain why she could not pay for therapy, but her refusal to accept free services prevents her finances from excusing her from participating in therapy.

16

We conclude that the evidence is factually and legally sufficient to permit the fact-finder to make credibility choices and form a firm conviction that termination of Gammill's parental rights is in R. A.'s best interest.

Affirmed.

_____

G. Alan Waldrop, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed

Filed:   May 22, 2009