**In the Matter of the MARRIAGE OF Karen Lynn CHANDLER and Billy John Stewart Chandler and in the Interest of Ash–Leah Kristina Chandler, a Minor Child.**

No. 07–95–0026–CV.

Court of Appeals of Texas, Amarillo.

Jan. 12, 1996.

Owen, Lyle, Voss & Owen, P.C., Rudd F. Owen, Kregg Hukill, Plainview, for appellant.

Shelton & Jones, Jennifer C. Beedy, Lubbock, for appellee.

Before DODSON, BOYD and QUINN, JJ.

QUINN, Justice.

Karen Lynn Haffner (formerly Chandler and referred to herein as Ms. Haffner) appeals from an order divesting her of managing conservatorship over her daughter, Ash–Leah Kristina Chandler (Ash–Leah). Through eight points of error, she attacks the legal and factual sufficiency of the evidence underlying the modification. We conclude that the trial court's findings are both legally and factually sufficient and that it did not abuse its discretion in arriving at the result it did. We further overrule each point of error and affirm the judgment.

## Background

Ms. Haffner and Billy Chandler (Chandler) divorced on July 13, 1992. At the time, the couple had a six year old child, Ash–Leah, over whom the mother was appointed managing conservator. Chandler received appointment as the child's possessory conservator but moved to change the designation approximately seventeen months later. He sought to replace Ms. Haffner as the child's primary caretaker. The court granted Chandler's motion and Ms. Haffner appealed.

## Standard of Review

Normally, whether to modify custody over a child lies within the trial court's sound discretion. *Wood v. O'Donnell,* 894 S.W.2d 555, 556 (Tex.App.—Fort Worth 1995, no writ); *Randle v. Randle,* 700 S.W.2d 314, 315 (Tex.App.—Houston [1st Dist.] 1985, no writ). The exercise of discretion will withstand appellate scrutiny except when clearly abused. *In re the Marriage of Hamer,* 906 S.W.2d 263, 265 (Tex.App.—Amarillo 1995, no writ); *Wood v. O'Donnell,* 894 S.W.2d at 556; *Eason v. Eason,* 860 S.W.2d 187, 191 (Tex.App.—Houston [14th Dist.] 1993, no writ). Yet, at bar, Ms. Haffner does not contend that the court so acted. Instead, she avers that various of its findings lacked legal and factual evidentiary support. Thus, we do not review this appeal under the customary standard mentioned in *Wood* or *Randle* but simply decide if the court's findings were supported by legally and factually sufficient evidence.[1]

## Guidelines Applicable to Changing Conservatorship

The pivotal guidelines which the court must heed in deciding whether to modify custody are found in the Texas Family Code. They dictate that an order appointing a sole managing conservator must stand as originally executed unless 1) the circumstances of the child, managing conservator, or possessory conservator materially and substantially change, 2) retaining the status quo potentially harms the child's welfare, and 3) appointing a new managing conservator constitutes a positive improvement. *Tex.Fam.Code Ann.* § 14.08(c)(1) (Vernon Supp.1995); *Wood v. O'Donnell,* 894 S.W.2d at 556; *Randle v. Randle,* 700 S.W.2d at 315. Moreover, the change must further the best interests of

---

1. Left for another day is the issue of whether those appealing questions controlled by the abuse of discretion standard actually present basis to secure reversal when they fail to argue, through point of error, that the discretion was indeed abused.

the child. *Id.* at 14.07(a) (stating that the best interests of the child shall always be the primary consideration in determining matters of conservatorship, support and access); *Randle v. Randle,* 700 S.W.2d at 315.

Though now creatures of statute, the elements expressed in § 14.08(c) of the Family Code went undefined by the legislature. So, courts have been left to develop a body of common law construing them. For instance, they recognize that not every changed circumstance warrants modification. *Jeffers v. Wallace,* 615 S.W.2d 252, 253–54 (Tex.Civ. App.—Dallas 1981, no writ). Yet, many deem changes which may injuriously affect the child's best interest sufficient to require modification. *Id.; Brown v. Brown,* 500 S.W.2d 210, 216 (Tex.Civ.App.—Texarkana 1973, no writ). Those include, among other things, remarriage by a parent, poisoning the child's mind against a parent, or mistreatment of the child by a parent or step-parent. *Jeffers v. Wallace,* 615 S.W.2d at 253–54; *Brown v. Brown,* 500 S.W.2d at 215–16.

■ Additionally, the state maintains a paramount interest in fostering a stable home environment for children. *Eason v. Eason,* 860 S.W.2d 187, 190–91 (Tex.App.— Houston [14th Dist.] 1993, no writ); *Neal v. Neal,* 606 S.W.2d 729, 731 (Tex.Civ.App.— Beaumont 1980, writ ref'd n.r.e.). To bolster this interest, jurists also hold that repeated changes in the child's home environment supply ground for redesignating managing conservators. *E.g., Eason v. Eason, supra* (child moving nine times within four years and mother's co-habitation with several men out of wedlock); *Scroggins v. Scroggins,* 753 S.W.2d 830, 832 (Tex.App.—Houston [1st Dist.] 1988, no writ) (child moving several times and adjusting to presence of new sibling); *Randle v. Randle,* 700 S.W.2d at 316–17 (holding that repeated change in the child's routine was injurious to the child's welfare).

■ Similarly, a course of conduct pursued by the manager which hampers the ward's opportunities to favorably associate with the other parent may also suffice. *E.g., Guy v. Stubberfield,* 666 S.W.2d 176, 179 (Tex.App.—Dallas 1983, no writ) (parent refusing to abide by a custody arrangement previously agreed to); *Gunther v. Gunther,* 478 S.W.2d 821, 829–30 (Tex.Civ.App.— Houston [14th Dist.] 1972, writ ref'd n.r.e.) (stating that "it is certainly necessary that children know, love, and be with each of their parents"); *McLeod v. McLeod,* 9 S.W.2d 141, 142 (Tex.Civ.App.—Eastland 1927, no writ) (denial by parent of child's access to other parent). No one can escape the fact that children are born to a couple. Whether married or not, the participants in that coupling have the natural and legal obligation to care for and nurture their offspring. In many respects, Texas jurisprudence also recognizes and enforces the child's entitlement to pursue and benefit from that association. *E.g., Reagan v. Vaughn,* 804 S.W.2d 463 (Tex. 1990) (describing the interests protected by allowing offspring to recover for the wrongful death of a parent). To unjustifiably interfere with the parent/child relationship is reprehensible under the law, especially when motivated by the angst and pain inherent in a divorce. As long ago expressed in *McLeod,*

> The child, during its formative period, has the right to have those having influence upon her refrain from implanting in her tender mind the seeds of hate and the cankerous beginnings of malice and ill will towards those whom she should cherish and respect ... While arrogance, superciliousness, and snobbishness are to be ... condemned, still a proper pride in one's ancestry and in the worthiness of one's parents is a necessary part of the equipment of a well-balanced person....

*McLeod v. McLeod,* 9 S.W.2d at 142. The trial judge below captured this truth in admonishing Ms. Haffner and Chandler that "you folks have divorced each other for whatever reason ... But the child didn't divorce either of you. And it's [the court's] obligation to see that the child has some semblance of parents and some semblance of order."

### Application of Facts to Guidelines

■ The evidence revealed that since she gained managerial custody of Ash–Leah in July of 1992, Ms. Haffner has moved the young girl to at least four places. The most distant was Alvarado, Texas, whereat the

child resided with an aunt for four months. During that period Ash–Leah and Chandler were effectively prohibited from communicating with each other because Ms. Haffner refused to disclose the girl's location. More importantly, the appellant conceded at trial that this was not in her daughter's best interests.

Additionally, the post-divorce arrangements experienced by the child while with her mother included living in quarters so cramped that Ash–Leah had to sleep either with her mother, or on a couch, or on the floor, or in a bedroom with male and female step-siblings. At one point the mother and child also resided in an apartment, to which the electricity had been disconnected. The trial court could well have deemed these substantial, material, and harmful changes worthy of alleviation.

That Ms. Haffner co-habitated with a male, conceived his child, and eventually married him comprise further indicia contemplated by § 14.08(c)(1)(A) of the Family Code. Additionally, Ms. Haffner now divided her attention among a new husband, his two children, their new baby and Ash–Leah rather than simply Ash–Leah. The size of Ms. Haffner's new household and the inherent costs in maintaining same may have been the basis for Chandler's observation that his daughter has come to appear malnourished and underdressed.

So too did the evidence show that the child was exposed to hostility directed at her father and interference with her ability to associate with him. As previously mentioned, Ms. Haffner sent Ash–Leah to live with relatives for several months. The impetus for her decision was Chandler's alleged threat to take his daughter away. Ms. Haffner later admitted that her ex-husband had done nothing to fulfill it, however. Witnesses also related instances when Ms. Haffner told Chandler "that Glen [her new husband] would get transferred and that [Chandler] would never see Ash–Leah again and that

she would make [the child] hate [him]." Also witnessed were instances wherein Ms. Haffner disposed of toys and gifts given the child by her father and paternal relatives. One individual also testified to an occurrence wherein the mother refused to release Ash–Leah to Chandler's sister despite Chandler's request and the admonitions of a policeman brought to the scene.[2] A witness eventually summarized the situation by stating that Ms. Haffner appeared uncooperative at most every opportunity. Indeed, her antagonistic behavior was exemplified as recently as the day before trial when Chandler appeared at the Haffner abode to lawfully exercise his visitation and neither Ms. Haffner nor the child were present. The composite of this evidence lends more than adequate support to the conclusion that the managing conservator endeavored to obstruct Chandler's relationship with his daughter.

That the foregoing circumstances, if accepted as true, were injurious to Ash–Leah's welfare is beyond gainsay. Both witnesses and prior case law hold as much. Chandler, himself a licensed vocational nurse, attested that Ash–Leah experienced "regression" and would find difficulty in developing trusting relationships if the adverse conditions were allowed to persist. He and others also stated that the girl suffered mood swings upon realizing that she would have to return to her mother after visitation. So too did they describe instances when Ash–Leah would plead to remain with Chandler and assume a fetal position while proclaiming that no one knew "what it was like" to live with Ms. Haffner.[3]

That it was in Ash–Leah's best interests to ameliorate the adverse circumstances which caused the potential harm was equally indisputable. Placing her in an environment which reduced over-crowding, competition for affection, instability, and hostility towards the absent parent could only have been an improvement in the life of this child. Having completed nursing school, having embarked

---

2. According to Chandler, the hostility between he and his ex-wife had grown so bad that he ventured to pick-up his daughter only in the presence of a military police officer.

3. Contrary to Ms. Haffner's suggestion, Chandler need not have proffered the testimony of an expert medical or psychological witness to carry his burden. *Villarreal v. Villarreal,* 684 S.W.2d 214, 219 (Tex.App.—Corpus Christi 1984, no writ).

**256**

on a new career, having arranged for Ash–Leah to have her own room and access to close relatives, and having indicated no venom towards Ms. Haffner, Chandler's selection as the parent best able to supply his daughter with the needed environment also had sufficient evidentiary basis.

Admittedly, evidence appeared of record which one could interpret as contradicting most everything said by Chandler, his sister and his mother. Ms. Haffner attested that though her situation may have been less than stellar shortly after the divorce, all had become better. To support her claim she tendered pictures of Ash–Leah playing with step-siblings and resting with her step-father. Furthermore, most if not all fault, according to her, lay with Chandler and his intractability. Yet, the conflicting evidence simply created a situation obligating the fact finder to perform its duty, that being to decide who to believe. Given the court's history with the parties, it may well have concluded that the scenario painted by Ms. Haffner was manufactured for purposes of the hearing, as suggested by Chandler.

Disregarding evidence to the contrary, one quickly sees that the findings have much more than a scintilla of evidentiary support; thus, they are legally sufficient. Additionally, the contradictory evidence, when the entire record is considered, is not of such magnitude so as to overwhelm the findings and render them wrong or unjust. Thus, they are also factually sufficient. *See Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.,* 766 S.W.2d 264, 275–76 (Tex.App.—Amarillo 1988, writ denied) (explaining the tests for legally and factually sufficient evidence).

Accordingly, we affirm the judgment.