Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio



★ ★ ★        ★ ★ ★

**MEMORANDUM OPINION**

No. 04-08-00911-CV

**IN THE INTEREST OF L.L.** and T.L., Children

From the 150th Judicial District Court, Bexar County, Texas
Trial Court No. 2001-CI-14960
Honorable Barbara Hanson Nellermoe, Judge Presiding

Opinion by:    Catherine Stone, Chief Justice

Sitting:        Catherine Stone, Chief Justice
                Sandee Bryan Marion, Justice
                Rebecca Simmons, Justice

Delivered and Filed: June 16, 2010

AFFIRMED IN PART; REVERSED IN PART

Appellant's motion for rehearing is denied. This court's prior opinion and judgment dated January 20, 2010 are withdrawn, and this opinion and judgment are substituted. We substitute this opinion to more fully explain the basis for our decision.

Ronald Leach challenges a series of orders in this appeal arising from a custody modification proceeding. Leach contends the trial court abused its discretion in modifying his right to designate the primary residence of T.L. because: (1) the trial court penalized Leach for his military service; and (2) the modification was not in T.L.'s best interest. Leach further contends the trial court erred in ordering him to pay attorney's fees in the absence of evidence to support the reasonableness of the attorney's fees. Finally, Leach contends the trial court erred in signing an order more than thirty days

after his notice of appeal was filed that required him to pay interim attorney's fees on appeal. We reverse the trial court's awards of attorney's fees, but affirm the trial court's order modifying T.L.'s conservatorship.

### PROCEDURAL BACKGROUND

Leach and Gina Acord were divorced in 2002. In 2007, Acord filed a petition to modify conservatorship seeking to be appointed as the person with the right to designate the primary residence of L.L. and T.L. The petition alleged that the circumstances of the children, a conservator, or other party affected by the order to be modified had materially and substantially changed since the date of the order's rendition. The petition further alleged that Leach had voluntarily relinquished the primary care and possession of the children to Acord for at least six months.

At the time of the hearing, L.L. was seventeen years old and filed a Choice of Managing Conservatorship, seeking to have Leach appointed as the parent with the right to determine her primary residence. T.L. was nine years old. Leach and Acord also had a third child, J.L., who was not a subject of the proceeding because she was nineteen years old.

The trial court conducted a three-day hearing on Acord's motion in May of 2008. At the conclusion of the hearing, the trial court appointed Leach as the person with the right to designate the primary residence of L.L., and appointed Acord as the person with the right to designate the primary residence of T.L. The trial court denied a motion for reconsideration after a hearing on August 21, 2008. The trial court also denied a motion for new trial after a hearing on November 17, 2008. At the conclusion of the hearing on the motion for new trial, the trial court verbally awarded Acord $1,400 in attorney's fees.

On January 30, 2009, the trial court held a hearing on Leach's motion to clarify or amend the trial court's order regarding travel arrangements and child support and on Acord's motion for interim attorney's fees. The trial court granted both motions. With regard to Acord's motion, the trial court ordered Leach to pay Acord $12,000 in interim appellate attorney's fees.

## MODIFICATION OF CONSERVATORSHIP

A trial court may modify a conservatorship order if: (1) modification would be in the best interest of the child; and (2) the circumstances of the child, a conservator, or other person affected by the order have materially and substantially changed since the date of the rendition of the prior order. TEX. FAM. CODE ANN. § 156.101 (Vernon Supp. 2009). The movant, in this case Acord, has the burden to prove these requirements by a preponderance of the evidence. *In re Z.B.P.*, 109 S.W.3d 772, 781 (Tex. App.—Fort Worth 2003, no pet.); *Holley v. Holley*, 864 S.W.2d 703, 706 (Tex. App.—Houston [1st Dist.] 1993, writ denied).

A.     Material and Substantial Change in Circumstances

In deciding whether a material and substantial change of circumstances has occurred, the court's determination is fact-specific and must be made according to the circumstances as they arise. *In re A.L.E.*, 279 S.W.3d 424, 428 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *In re T.W.E.*, 217 S.W.3d 557, 559 (Tex. App.—San Antonio 2006, no pet.). Some of the factors a trial court can consider in evaluating whether circumstances have materially and substantially changed include the remarriage of one of the parties, repeated changes in the child's home environment, and poisoning of a child's mind by one of the parties. *In re A.L.E.*, 279 S.W.3d at 429; *In re Marriage of Chandler*, 914 S.W.2d 252, 254 (Tex. App.—Amarillo 1996, no writ). On appeal, we will not disturb a trial court's ruling on a motion to modify conservatorship unless a clear abuse of discretion is established

by the complaining party. *In re J.S.P.*, 278 S.W.3d 414, 418 (Tex. App.—San Antonio 2008, no pet.).

In his second point of error, Leach asserts the trial court erred in finding that he voluntarily relinquished possession of the children when he was deployed for military service. In his third point of error, Leach contends the trial court's order stripped him of custody of T.L. because of his military service. Leach notes that recent amendments to the Texas Family Code, which are not applicable to the instant case, preclude a trial court from considering military deployment as a basis for finding voluntary relinquishment.

Although the recent statutory amendments preclude a trial court from modifying a conservatorship order based on voluntary relinquishment when the relinquishment is due to military deployment, the amended statute does not preclude a trial court from considering evidence of a parent's military deployment in determining whether circumstances have materially and substantially changed. *Compare* TEX. FAM. CODE ANN. § 156.101(b) (Vernon Supp. 2009) *with* TEX. FAM. CODE ANN. § 156.105 (Vernon Supp. 2009). Instead, the amended statute provides only that military deployment does not "by itself" constitute a material and substantial change of circumstances. TEX. FAM. CODE ANN. § 156.105 (Vernon Supp. 2009). Accordingly, even under the amended statute, military deployment and its effect on a child can be a factor that a trial court can consider; it simply cannot be the exclusive factor.

In this case, evidence was presented regarding Leach's three deployments since the 2002 divorce; however, nothing in the record suggests that the trial court placed greater emphasis on this evidence than other evidence of changes in circumstances. In this case, the trial court first heard evidence that both parents had remarried. *See In re A.L.E.*, 279 S.W.3d at 429. In addition, the

record reveals that immediately after the divorce in April of 2002, J.L. and L.L. went to live with their paternal grandparents in Ohio, while T.L. continued to reside with Acord. Beginning in October of 2002, the children resided with Leach in Kentucky; however, T.L. spent the summer of 2003 with Acord. In July of 2003, the children went to reside with their paternal grandparents in Ohio. In December of 2003, J.L. had some conflicts with her paternal grandparents. At that time, L.L. and T.L. moved to Texas to live with Acord. In April of 2004, J.L. had additional conflicts with her paternal grandparents and went to live with her paternal uncle in Ohio. From June of 2004 through the middle of October of 2004, the children resided with Leach in Kentucky. After Leach was again deployed, the children's maternal grandmother and maternal aunt moved to Kentucky to care for the children. Toward the end of November of 2004, T.L. moved to Texas to live with Acord. At the end of April of 2005, J.L. moved to Texas to live with Acord because she was refusing to go to school. In the middle of June of 2005, all of the children moved to live with Acord in Texas. In summary, the children had changed residences approximately nine times in five years. As previously noted, repeated changes in the child's home environment is a factor a trial court may consider in finding a material and substantial change in circumstances. *In re Marriage of Chandler*, 914 S.W.2d at 254. Accordingly, we conclude the trial court did not abuse its discretion in finding that a material and substantial change in circumstances had occurred since the 2002 divorce decree.

B.      Best Interest of the Child

        1.      Standard of Review

        In his first point of error, Leach asserts that the modification of conservatorship was not in T.L.'s best interest. In determining issues of possession and access, the primary consideration is always the best interest of the child. *In re J.S.P.*, 278 S.W.3d at 418. Trial courts have broad

discretion to determine what is in a child's best interest. *Id.* In determining the best interest of a child in the context of modification of conservatorship, a trial court may consider: (1) the child's desires; (2) the child's emotional and physical needs now and in the future; (3) any emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking primary possession; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by those seeking primary possession; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; (9) any excuse for the acts or omissions of the parent; (10) the child's need for stability; and (11) the need to prevent constant litigation regarding conservatorship of the child. *In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000); *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re C.A.M.M.*, 243 S.W.3d 211, 221 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

Because conservatorship determinations are intensely fact driven, the trial court is in the best position to observe the witnesses and "feel" the forces, powers, and influences that cannot be discerned by merely reading the record. *In re J.S.P.*, 278 S.W.3d at 418-19. We defer to the trial court's resolution of underlying facts and to credibility determinations that may have affected its determination, and we will not substitute our judgment for the trial court's. *In re A.L.E.*, 279 S.W.3d at 427. Legal and factual insufficiency challenges are not independent grounds for asserting error in custody determinations. *Id.* at 427-28; *In re M.M.S.*, 256 S.W.3d 470, 476 (Tex. App.—Dallas 2008, no pet.). Instead, we consider whether the trial court had sufficient evidence upon which to exercise its discretion and, if so, whether it acted reasonably in the application of its discretion to those facts. *In re M.M.S.*, 256 S.W.3d at 476. An abuse of discretion does not occur if some

evidence of a substantive and probative character exists to support the trial court's decision. *In re A.L.E.*, 279 S.W.3d at 428; *In re M.M.S.*, 256 S.W.3d at 476.

2.      Discussion

The trial court decided not to interview T.L. because of his age, and T.L. was not asked to express a desire with regard to conservatorship. As evidence that T.L. had expressed a desire to spend more time with Leach, Leach relies on testimony from Linda Fisher, who performed a court-ordered social study and recommended that Leach remain as the conservator to designate T.L.'s residence. In context, however, Fisher testified that she asked T.L. how he felt when he left Leach's house, and it was time to go back to Acord's house. T.L. responded, "Well, I feel both happy and sad, because I want to spend more time with my dad." Leach appears to discount that T.L. feels ***both*** happy and sad; apparently T.L. was happy to be returning to his home with Acord.

With regard to T.L.'s emotional and physical needs, T.L. had been residing with Acord since December of 2004. Prior to that date, possession of T.L. had alternated between Acord and Leach based on Leach's deployments to Iraq and Afghanistan and the need for T.L. to finish a school year where he started. Several periods of time when T.L. was not in Acord's possession, however, he also was not in Leach's possession. Instead, he was living with his paternal grandparents or his maternal grandmother and aunt. In 2006 and 2007, T.L. had resided with Leach for approximately four weeks in each year.

T.L. had attended the same montessori school for four years while residing with Acord. Although the montessori school had suggested having T.L. tested for attention deficit disorder, the school continued to work on alternative ways to keep T.L. focused and to assist him with his slow work pace. T.L.'s teacher, Maria Flores, testified that T.L. is bright, happy, but slow in producing

work. Flores had been T.L.'s teacher for three years. Flores stated that she and Acord had a strong parent/teacher relationship, and the two had worked closely together on ways to motivate T.L. to improve his work pace. Flores did not have any contact with Leach prior to the fall of 2007. Flores testified that she understood that Leach had been deployed several times; however, she stated that she often communicated with parents who are deployed through e-mail.

Leach testified regarding his analysis of T.L.'s school records and the reasons he believed that T.L. was not performing well. Leach presented a chart summarizing his analysis. In response to the reason Leach did not have the current school year on his chart, Leach responded, "considering the entourage of school members that came in here and seemed to be somewhat biased once the litigation started, it was not an honest reflection of what was going on anymore." Leach subsequently agreed, however, that his assessment of T.L.'s grades did not include several areas where the school reports showed that T.L. was exceeding expectations, including the school records showing that T.L. met all expectations for math, cultural studies, history, physical science, and geography in 2007-2008. Leach explained that his charts were focused on social behavior, learning characteristics, and attitudes. Leach also expressed a concern with T.L.'s excessive tardies; however, Acord explained that the tardies were from being at the most five minutes late when she had to drop J.L. and L.L. at another school before taking T.L. to school, which was also the school where Acord was working at the time.

In response to whether T.L. was a bright boy, Dr. Fernando J. Esparza, a clinical psychologist who performed a court-ordered evaluation of the parties and the children, responded that T.L. "was off the charts." Dr. Esparza stated that T.L.'s IQ was impressive and his verbal skills were amazing. Dr. Esparza stated that T.L. had a lot of positive exposure to learning. Dr. Esparza did not believe

T.L. would be a candidate for medication if he had ADD; however, he would want the problem identified so appropriate interventions could be made. Dr. Esparza believed, however, that testing for ADD should occur several weeks after the beginning of a school year. At the time of the hearing on the motion for new trial, T.L. was on the A/B honor roll in a gifted and talented program at a public school and was undergoing testing for ADD.

Both J.L. and L.L. believed T.L. should reside with Leach; however, there was evidence that J.L. and L.L. had a lot of animosity toward Acord's husband, Mark Davidson, with whom Acord had been living since her divorce from Leach. The animosity culminated in a confrontation in September of 2007 between J.L. and Davidson regarding a dent Davidson believed J.L. had caused in Acord's new car. At the end of the confrontation, J.L., who was nineteen-years-old, threw a mug full of orange juice at Davidson, and Davidson ordered J.L. to leave if she could not follow the rules of the house. After this confrontation, Leach's plan was to rent an apartment where J.L., who recently disclosed she was pregnant, and L.L. would live by themselves, and T.L. would go to live with Leach's wife in Maryland since Leach was still stationed in North Carolina and T.L. would be unable to live with him. When Fisher was asked about this plan, she responded, "I wasn't there at the time. I don't know the specifics of that. But of course, it's not the greatest idea." When Leach's wife was asked about the plan to move J.L. and L.L. into an apartment, she responded, "Not my decision, ma'am. It's their father's."

Accord testified that Leach adversely affected the relationship between Davidson, J.L., and L.L. by blaming Davidson for the divorce and discussing Leach's opinion of Davidson with J.L. and L.L. Leach admitted that he characterized Davidson as psychotic. Leach stated that he did not think that he had expressed his opinions about Davidson to J.L. or L.L. In response to how J.L. and L.L.

developed the idea that Davidson was paranoid, Leach responded that it sounded like they were just corroborating what he had seen. J.L., who was called to testify by Leach, stated that she knew Leach had opinions about Davidson, but Leach "usually" stopped himself when expressing them. When Davidson realized his mental health would become an issue in the proceedings based on a prior hospitalization, he contacted Dr. Joann Murphey, a clinical psychologist, for an evaluation. Both Dr. Murphey and Dr. Esparza examined Davidson and concluded that Davidson had no on-going clinical diagnosis. Dr. Murphey testified that even L.L. had reported a positive relationship between Davidson and T.L. Despite the conclusions reached by Dr. Murphey and Dr. Esparza, Fisher listed Davidson's evaluation as one of the reasons she recommended that Leach remain as the conservator to designate T.L.'s residence.

Fisher also testified that she was unaware that Leach had been arrested after assaulting three military police officers while his six-year-old stepdaughter was sitting in the vehicle he was driving. Fisher later stated that she recalled Leach telling her that he had been arrested over a mistake regarding his driver's license. In response to whether she was concerned about the incident, Fisher responded, "I mean, I guess I would be concerned if he was fighting the MPs - as she [Acord's attorney] said and there was a child in the car. But I am not aware of that incident in that context."

Questions were asked regarding Acord's failure to provide proper medical and dental care for the children. Acord testified that finances precluded her from obtaining the proper care. Acord acknowledged that the children were covered by Leach's military benefits, but stated the benefits did not cover all of the medical expenses when the children went outside the military facility as was required when L.L. needed to see a specialist regarding her ankle. Acord stated that L.L. was not originally referred to a specialist until she re-injured her ankle by wearing high heels. Because the

military system did not have a podiatrist, obtaining a referral took time. In response to Acord's delay in obtaining a brace for L.L.'s ankle, Acord testified that the brace was suggested, not ordered, and she did not believe it took her a month to get the brace. Acord testified that a $1,000 up front deposit was required for braces for L.L.'s teeth. In response to questions regarding her cancellation of numerous dental appointments, Acord explained that she had cancelled only a few, but the cancellation of one appointment automatically cancelled follow-up appointments so the record reflected more cancellations. In response to questions regarding an account established by Leach to which Acord had access to pay the medical expenses, Acord responded, "Ma'am I wasn't about to spend more than what we had talked about without – I was very reluctant to use that account, because anytime I use his money, he likes to point it out often how much he's helped out. And I didn't have permission at the time. It was my understanding with the Court Order and all that I was supposed to be handling at least half of those costs, and I didn't have the money."

Fisher also stated that T.L. not having playmates in the community was a basis for her recommendation; however, Flores, T.L.'s teacher, testified that T.L. had many friends, commenting that "pretty much anybody he encounters becomes a friend." Acord testified that T.L. spends a lot of time in after-school care with playmates, including his best friend. T.L. also had been enrolled in Tae Kwon Do and had made friends through that class.

C.    Conclusion

As previously noted, the trial court is afforded wide discretion in modification proceedings because the trial court is in the best position to observe and evaluate the personalities of the parties and the credibility of the witnesses. *See In re J.S.P.*, 278 S.W.3d at 418-19; *In re A.L.E.*, 279 S.W.3d at 427. In this case, the trial court heard evidence regarding T.L.'s living arrangements since the

divorce and the stable home provided by Acord. Although J.L. and L.L. described the atmosphere at Acord's home as cold, the trial court could have chosen to discount this testimony based on evidence of the animosity J.L. and L.L. had toward Davidson. Although Leach testified that Davidson was psychotic, both Dr. Murphey and Dr. Esparza testified that Davidson had no on-going clinical diagnosis. The trial court also heard evidence from which it could conclude that Leach had adversely affected J.L.'s and L.L.'s opinions of Davidson. T.L.'s teacher and Dr. Esparza testified regarding T.L.'s abilities. Although both recommended testing for ADD, T.L. was performing at or above his grade level academically. The trial court had several bases on which to question Fisher's recommendation including her lack of knowledge of two events adversely reflecting on Leach's decisions involving children: (1) planning to place J.L. and L.L. in an apartment together alone; and (2) assaulting three MPs after being stopped while his young stepdaughter was in the car. *See McGalliard v. Kulmann*, 722 S.W.2d 694, 697 (Tex. 1986) (noting trial court is free to reject expert opinion based on evidence as a whole). Moreover, the trial court was in the best position to weigh the testimony of other witnesses based on their relationships with Acord and Leach. Finally, during Leach's testimony, the trial court had to admonish him regarding his role in the proceedings. As previously noted, the trial court is in the better position to observe and evaluate the personalities of the parties, and the trial court's evaluation of the parties' personalities can also form a basis for its decision. Having reviewed the record as a whole, we hold that the trial court did not abuse its discretion in finding that modification was in T.L.'s best interest. *See MacDonald v. MacDonald*, 821 S.W.2d 458, 463 (Tex. App.—Houston [14th Dist.] 1992, no writ) ("When presented with conflicting evidence, the trier of fact has several alternatives: it may believe one witness and

disbelieve others; it may resolve the inconsistencies in the testimony of any witness; and it may accept lay testimony over that of experts.")

## ATTORNEY'S FEES

In his fourth point of error, Leach contends the trial court erred in ordering him to pay Acord attorney's fees because no evidence supports the reasonableness of the fees. The trial court's order modifying conservatorship ordered that attorney's fees would be borne by the party who incurred them. At the conclusion of the hearing on Leach's motion for new trial, the trial court verbally awarded Acord $1,400 in attorney's fees; however, no written order was signed with regard to this award.

Any award of attorney's fees must be supported by evidence. *In re C.Z.B.*, 151 S.W.3d 627, 635 (Tex. App.—San Antonio 2004, no pet.). To support an award of reasonable costs, testimony should be presented regarding the number of hours spent on the case, the nature of the preparation, the complexity of the case, the experience of the attorney, and the prevailing hourly rates. *Id*. Expert testimony is required to establish the reasonableness of the fee. *Phillips v. Phillips*, 08-06-00171-CV, 2009 WL 792756, at *9 (Tex. App.—El Paso Mar. 26, 2009, pet. denied); *Cantu v. Moore*, 90 S.W.3d 821, 826 (Tex. App.—San Antonio 2002, pet. denied). In this case, the only testimony at the hearing on the motion for new trial regarding attorney's fees was testimony by Acord regarding her attorney's hourly rate and the amount she had paid. Because no expert testimony was presented to establish the reasonableness of the attorney's fees, the trial court erred in awarding Acord attorney's fees. *See Phillips*, 2009 WL 792756, at *9; *Cantu*, 90 S.W.3d at 826. Leach's fourth point of error is sustained.

In his fifth point of error, Leach contends the trial court erred in ordering him to pay interim attorney's fees on appeal pursuant to section 109.001 of the Texas Family Code. Section 109.001 vests a trial court with discretionary authority to render temporary orders, including temporary orders requiring the payment of reasonable attorney's fees, as necessary to protect the welfare of children during the pendency of an appeal. TEX. FAM. CODE ANN. § 109.001(a)(5) (Vernon 2008). However, section 109.001 contains an absolute deadline requiring such orders to be rendered not later than the 30th day after the date an appeal is perfected. *See id*; *see also Love v. Bailey-Love*, 217 S.W.3d 33, 36-37 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *In re Boyd*, 34 S.W.3d 708, 711 (Tex. App.—Fort Worth 2000, orig. proceeding).

In this case, Leach perfected this appeal on December 17, 2008; however, the hearing regarding the interim attorney's fees was not held until January 30, 2009, and the trial court did not sign the order until March 6, 2009. Accordingly, the trial court's order requiring Leach to pay interim attorney's fees is void. *In re Boyd*, 34 S.W.3d at 711. Leach's fifth point of error is sustained.

## CONCLUSION

The portions of the trial court's orders awarding Acord $1,400 in attorney's fees and $12,000 in interim attorney's fees on appeal are reversed. The remaining portions of the trial court's orders are affirmed.

Catherine Stone, Chief Justice