

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-13-00083-CV

_____


IN THE INTEREST OF K.C.B., A MINOR CHILD



On Appeal from the County Court at Law
Hopkins County, Texas
Trial Court No. 37,125 CCL



Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

# MEMORANDUM OPINION

K.C.B.'s mother, grandmother, and half-sister were killed in a tragic house fire in 2006. His father was incarcerated shortly thereafter for the offense of unlawful possession of a firearm. Deborah Ann Brice, K.C.B.'s paternal grandmother, and Tommy Neal, K.C.B.'s maternal grandfather, were designated as the child's joint managing conservators, with K.C.B.'s maternal aunt, Mindy Friddle, being designated as an alternate joint managing conservator in the event of Neal's death or incapacitation.

In 2012, Neal and Friddle filed a modification action to remove Brice as a joint managing conservator on the grounds that Brice (1) failed to comply with an order that she make herself available to a licensed counselor, (2) had no contact with K.C.B. for a period of at least sixteen months due to a previous restraining order preventing her interaction with the child, (3) kept a tax refund check belonging to K.C.B., and (4) breached her fiduciary duty to K.C.B. by cashing $10,632.00 in Social Security payments intended to benefit K.C.B., spending funds on attorney's fees to get the child's father out of prison, and on "different things" purchased during the sixteen-month period when she was prevented from seeing the child. Neal and Friddle also requested that the court deny Brice access to and possession of K.C.B. As a result of Neal and Friddle's modification suit, the trial court removed Brice as managing conservator, denied her possession of and access to K.C.B., and named Neal and Friddle joint managing conservators.

Appealing from this order, Brice argues (1) that the trial court was without jurisdiction to preside over the modification proceedings because Friddle lacked standing to bring a modification suit and (2) that the trial court abused its discretion (a) in removing her as a joint

2

managing conservator and (b) in denying her possession of or access to K.C.B.  We find that Friddle had standing to seek modification of the order naming her alternate conservator and conclude that the trial court's judgment constituted a proper exercise of its discretion.

## I.    Friddle Had Standing to Seek Modification

Brice argues on appeal that the trial court lacked jurisdiction over the subject matter of this case because Friddle lacked standing to seek Brice's removal as a joint managing conservator.  "Standing, which is implicit in the concept of subject-matter jurisdiction, is a threshold issue in a child custody proceeding."  *In re Crumbley*, 404 S.W.3d 156, 159 (Tex. App.—Texarkana 2013, orig. proceeding).  "Whether a party has standing to pursue a cause of action is a question of law."  *Id.*

"A party affected by an order may file a suit for modification in the court with continuing, exclusive jurisdiction."  TEX. FAM. CODE ANN. § 156.002 (West Supp. 2013).  Under this statute, "to be a 'party,' a person must be a party to the order the person seeks to modify."  *In re S.A.M.*, 321 S.W.3d 785, 789 (Tex. App.—Houston [14th Dist.] 2010, no pet.).  Friddle is a party to the 2010 order which she sought to modify since she was named as an alternate conservator in that previous order.

Friddle was also affected by the order.  "[A] party to an order regarding conservatorship [can] seek modification of the prior order under section 156.002(a) even though the party was given no conservatorship rights under that order" if the party is affected by the order.  *Id.* at 790–91 (citing *In re J.R.*, 222 S.W.3d 817, 818–19 & n.5 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (looking to the definition of "affected" in Webster's Third New International

3

Dictionary). Under the 2010 order, should Neal become incapacitated, Friddle was to assume the role of a joint managing conservator of K.C.B. Without question, Friddle was a party to the 2010 order, and the order affected her. Therefore, she had standing to seek modification of that order.

We overrule Brice's first point of error.

## II. The Trial Court's Ruling Was a Proper Exercise of its Discretion

The Texas Family Code authorizes a trial court to modify an order that appoints a child's conservators, sets the terms and conditions of conservatorship, and provides for the possession of a child if modification would be in the best interest of the child and the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the date of the rendition of the order. TEX. FAM. CODE ANN. § 156.101(a)(1)(A) (West Supp. 2013).

### A. Evidence from the Final Hearing

At the age of one, and as a result of his mother's military deployment, K.C.B. moved into Brice's home. Brice was a respiratory therapist and had the means to provide for the child. K.C.B. was three when a house fire claimed his mother's life. In 2006, after the death of K.C.B.'s mother, Brice was given the right to designate the child's residence. She took care of the child, shared responsibility for and possession of the child with Neal, and transported the child regularly to his therapy sessions with Ginger Brooks, a licensed professional counselor.

Thereafter, the relationship between Neal and Brice soured. Brice believed that Neal blamed her son for starting the fire that killed K.C.B.'s mother, even though her son was at

4

another location with K.C.B. at the time of the fire, and notwithstanding the results of an investigation that concluded the cause of the fire was unknown. Neal testified that he "didn't appreciate" the way his daughter was treated by K.C.B.'s father. While K.C.B.'s father was on community supervision for a felony offense committed prior to K.C.B.'s birth, Neal loaned him a firearm and encouraged him to go hunting with friends. By his own admission, Neal knew that K.C.B.'s father was on felony community supervision when he loaned him the gun. K.C.B.'s father was arrested shortly after he left on the hunting trip.

While K.C.B. lived with Brice for three years after the fire, K.C.B. saw his father in prison "once a month if not twice every other month—every other weekend." Thereafter, Neal and Friddle, along with some friends and family members, engaged in a letter-writing campaign to the parole board asking that K.C.B.'s father be denied parole. Brice uncovered these actions. She admitted at trial that she made three allegations against Neal and Friddle to Child Protective Services, to no avail.

Brice's animosity toward Neal and Friddle began to affect K.C.B. Noticing that teachers were beginning to express concern about K.C.B.'s anger and disruptive behavior in class, counselor Brooks testified, "I think what I was seeing from [K.C.B.] in my sessions was the amount of conflict, and mainly coming from Ms. Brice, was having a very negative impact on [K.C.B.], and it was clear that that was affecting him in school." According to Angela Sancho, K.C.B.'s first-grade teacher at North Hopkins School, "[K.C.B.] said that his grandmother told him to misbehave at school . . . so that . . . he could go live with her and leave the Neals." Neal clarified, "[Brice] doesn't want [K.C.B.] to like us. . . . And she, even through the schools, told

5

him to do bad when he goes from our house and do good when he comes from her house." According to Tracy Brandenburgh, K.C.B.'s second-grade teacher, K.C.B. told her that another family member instructed him not to tell the counselor that Brice had slapped him. According to Brandenburgh, K.C.B. said, "Well, she slaps me around, but I want to see her, and I'm willing to put up with that so I can still see her."

In 2010, after these concerns were expressed to the court, Brice was ordered to engage in counseling sessions with Israel Lewis. Brice, who denied ever slapping K.C.B., testified that she visited with Lewis approximately five times and that she did not return because she was not told to return.[1] Brooks testified that Lewis informed her that he only engaged in two counseling sessions with Brice and that no progress had been made. That year, Neal and Friddle moved to modify the conservatorship order. Following an October 18, 2010, jury trial, the trial court's November 19, 2010, order removed Brice's right to designate the child's primary residence, assigned that right to Neal, and named Friddle alternate managing conservator. Brice remained as a joint managing conservator with standard right of possession and access to K.C.B.

Several events occurred since 2010 that led Neal and Friddle to file suit to modify the 2010 conservatorship arrangement and seek an order restraining Brice from K.C.B.'s presence. Brooks testified that "the bond between K.C.B. and Brice was affected by her negativity of his family—his maternal family." Brooks stated that Brice frequently yelled at and cussed K.C.B. and that she had slapped him on several occasions, including as punishment for talking and

---

[1] The order did not specify the number of counseling sessions required, and Lewis did not testify at trial.

playing with Neal at a ballgame. Brooks testified that K.C.B. feared Brice. Neal described the incident giving rise to the petition for a restraining order as follows:

> Well, we were—he started basketball—Little Dribblers—and it was [Brice]'s weekend. But school was a neutral ground. And so we knew he was going to have his first practice, so Linda and I just looked into the gym. We went in. And [Brice] was in the stands, and we weren't interfering at all. And [K.C.B.] saw us. He come over and give—run and give us a hug. And I told him—said, go back out there and listen to your coach. And that was the only interaction we had with him.
> But when she got him back in the car, what he told us is she had slapped him because he had something to do with us and it was her weekend.

The trial court entered a temporary restraining order against Brice on June 11, 2011. K.C.B., who was seven, was removed from Brice's home and from North Hopkins School, which Neal classified as a "Grade A" school, to Como-Pickton school, a "Triple A" school. Although Brice was informed that she would be afforded a hearing to lift the restraining order, she did not request one. Her attempts to see the child were met with responses from Neal that he did not wish to violate the court order.

In December 2012, Neal and Friddle filed an amended motion to modify the conservatorship of K.C.B.[2] At the time of trial, which was held April 23, 2013, Brice had been restrained from the child for almost two years and had not seen him once. Neal testified at trial that he had witnessed a great turnaround in K.C.B. as a result of his emancipation from Brice. In describing why he believed the permanent denial of access and possession to Brice was in K.C.B.'s best interest, Neal focused on

---

[2]Neal and Friddle also sought to terminate the parent-child relationship between K.C.B. and his father. They were unsuccessful in this effort.

7

how he has done in the last two years without her in his life. To see the difference, the anger that he had, the hysteria that he had, the things that he—that would set him off at a moment's notice. And he now has coping skills.

He may get angry. He plays basketball, and he might get irritated, but he doesn't take it out in fits of rage like he used to. He's beginning to control himself more. I don't think it would have happened had she been with him.

Friddle testified that for the ten months preceding the April 2013 trial, K.C.B. had been living with her, her husband, and their five children in a four-bedroom home close to Neal.[3] K.C.B. played with Friddle's children, ages eighteen months to thirteen-years old. Friddle testified that K.C.B. "made a lot of new friends" at his new school, was behaving himself in class, and was receiving special education classes to get him "caught up in math." Dusty O'Brian, an employee of Como-Pickens School, described K.C.B. as "[v]ery easy going, very helpful, very loving." O'Brian stated that K.C.B. got along well with others at school. K.C.B. was also playing basketball and becoming involved in the music and ministries program at Friddle's church. Noting K.C.B.'s improvement in demeanor, Friddle opined that Brice was more a harmful than helpful influence on K.C.B. In Friddle's words, "Instead of lifting him up and being a positive person . . . she's downward."

Brooks agreed that living with Friddle "had a good impact on [K.C.B.]." She testified, [A] lot of [K.C.B.'s] anger is starting to go away." She also noted that K.C.B.'s behavior had improved since moving in with Friddle and concluded, "[H]e's pretty stable right now." Brooks

---

[3]Brice argues that Neal "failed to follow the court's order that the child reside with him, at his primary residence, opting instead to allow K.C.B. to reside with his daughter Mindy Friddle from the time he was appointed until the time of the instant hearing, which demonstrates his lack of ability or desire to act as K.C.B.'s managing conservator."

testified that she did not believe it to be in K.C.B.'s best interest to have a continued relationship with Brice. In support of this conclusion, Brooks noted,

> [Brice] never promoted his relationship with his other family. In fact, she was destructive to his love for them and the time that they spent together.
> And because she was always just trying to alienate him from his family was the reason that I made the suggestion that she get involved in some therapy to help her understand that they would be involved in his life and maybe she could change her perspective that would be more healthy for [K.C.B.].

Aside from Brice's alleged negative influence on K.C.B., Neal and Friddle raised allegations that Brice was keeping the child's money. Under a previous court order, Brice was to "receive and give receipt for periodic payments for the support of the child and to hold or disburse these funds for the benefit of the child." K.C.B. was receiving Social Security survivor benefits, which were sent in the form of a monthly check payable to both K.C.B. and Brice. After she was no longer the managing conservator of the child with the right to designate his residence, Brice continued to cash the Social Security checks. In total, she admitted to cashing and spending $10,632.00 of K.C.B.'s Social Security survivor benefits. More than one-half of this sum was collected by Brice after K.C.B. was removed from her home.

Additionally, Certified Public Accountant Amy McGrady explained that K.C.B. had received a sizable sum as the beneficiary of an insurance policy belonging to his mother; this money was held in an investment account that was managed by Edward Jones & Company, an investment firm. According to McGrady, during 2009 and 2010, the Edward Jones account realized some investment income, including the maturation of a large certificate of deposit that the Internal Revenue Service viewed as income. Brice filed the tax returns and reported these

sums as required, but she kept the $8,483.00 and $419.00 refunds that resulted from those returns instead of depositing them into K.C.B.'s Edward Jones account.

Brice testified that she believed the refunded money was hers to keep because the refund checks included her name. She spent the money on attorney's fees "on [K.C.B.'s] dad to help get him out so [K.C.B.] could go back to his father," and on other "different things." Brice did not believe that she should be removed as a joint managing conservator and opined that denying her possession of and access to K.C.B. would not be in his best interest because she allowed the child to visit his father, something Neal and Friddle refused to do.

### B.    Standard of Review

"We review a trial court's decision regarding custody, control, and possession matters involving a child under an abuse of discretion standard." *In re A.L.W.*, 356 S.W.3d 564, 566 (Tex. App.—Texarkana 2011, no pet.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)); *see In re P.M.G.*, 405 S.W.3d 406, 410 (Tex. App.—Texarkana 2013, no pet.). "A trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or legal principles." *A.L.W.*, 356 S.W.3d at 566 (citing *K–Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000); *Holtzman v. Holtzman*, 993 S.W.2d 729, 734 (Tex. App.—Texarkana 1999, pet. denied)).

"Under the abuse-of-discretion standard, alleged legal insufficiency and factual insufficiency of the evidence are not independent grounds of error, but are merely factors in assessing whether the trial court abused its discretion." *In re S.A.E.,* No. 06-08-00139-CV, 2009 WL 2060087, at *2 (Tex. App.—Texarkana July 17, 2009, no pet.) (mem. op.); *see P.M.G.*, 405

10

S.W.3d at 410. Where a sufficiency review "overlaps the abuse of discretion standard . . . we engage in a two-pronged inquiry." *S.A.E.*, 2009 WL 2060087, at *2 (citing *Giron v. Gonzalez*, 247 S.W.3d 302, 306 (Tex. App.—El Paso 2007, no pet.)). "We ask if the trial court had sufficient information on which to exercise its discretion and whether it erred in its application of that discretion." *Id*.

Because Brice did not bear the burden of proof at trial, we analyze the legal sufficiency issue as a "no-evidence" challenge. *Giron*, 247 S.W.3d at 306 (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)). We consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

In a factual sufficiency analysis, we consider all the evidence and set aside the findings only if they are so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust, shock the conscience, or clearly demonstrate bias. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986); *In re G.R.W.*, 191 S.W.3d 896, 899 (Tex. App.—Texarkana 2006, no pet.).

In a nonjury trial, when no findings of fact or conclusions of law are filed or requested, we infer that the trial court made all the necessary findings to support its judgment. *Roberson v.*

11

*Robinson*, 768 S.W.2d 280, 281 (Tex. 1989) (per curiam); *Waltenburg v. Waltenburg*, 270 S.W.3d 308, 312 (Tex. App.—Dallas 2008, no pet.); *Mays v. Pierce*, 203 S.W.3d 564, 571 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). When the inferred findings of fact are supported by the evidence, the appellate court must uphold the judgment on any theory of law applicable to the case. *Giangrosso v. Crosley*, 840 S.W.2d 765, 769 (Tex. App.—Houston [1st Dist.] 1992, no writ). In addition, we defer to the trial court to resolve conflicts in the evidence and to determine the weight to be given the testimony. *Bates v. Tesar*, 81 S.W.3d 411, 425 (Tex. App.—El Paso 2002, no pet.).

### C.    Material and Substantial Change

We must first decide whether there was evidence demonstrating that the circumstances of the child, a conservator, or other party affected by the trial court's previous order had materially and substantially changed since the date of the previous order. TEX. FAM. CODE ANN. § 156.101(a)(1) (West Supp. 2013). "In deciding whether a material and substantial change of circumstances has occurred, a trial court is not confined to rigid or definite guidelines." *In re A.L.E.*, 279 S.W.3d 424, 428 (Tex. App.—Houston [14th Dist.] 2009, no pet.). "Instead, the court's determination is fact-specific and must be made according to the circumstances as they arise." *Id.* Changes in a child's home surroundings or circumstances rendering a conservator unsuitable are examples of the material and substantial changes contemplated by Section 156.101(a)(1). *Id.* (citing *In re Marriage of Chandler*, 914 S.W.2d 252, 254 (Tex. App.—Amarillo 1996, no writ); *Wright v. Wright*, 610 S.W.2d 553, 555 (Tex. App.—Houston [1st Dist.] 1980, no writ).

12

Since the entry of the trial court's previous November 2010 order modifying the conservatorship arrangement, Brice had been restrained from K.C.B. for a period of almost two years, and K.C.B. had moved into Friddle's home and was attending a new school. Also since that order was entered, Brice had been accused of misappropriating K.C.B.'s money and poisoning the child's mind against his maternal family. We conclude that these facts were sufficient for the court to find a material and substantial change in the parties' circumstances.

### D.     Best Interests of the Child

"The Legislature has made clear that '[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child.'"[4] *Lenz v. Lenz*, 79 S.W.3d 10, 14 (Tex. 2002) (quoting TEX. FAM. CODE ANN. § 153.002 (West 2008)). The public policy of this state is to provide a safe, stable, and nonviolent environment for the child. TEX. FAM. CODE ANN. § 153.001(a)(2) (West 2008).

Brooks believed that K.C.B. was fearful of Brice, who had physically disciplined him for showing affection towards Neal. Brooks suggested that removing Brice's access to and possession of K.C.B. was in his best interest given Brice's attempts to alienate him from his maternal family. K.C.B.'s first- and second-grade teachers testified that K.C.B. had anger issues and was disruptive in class. They also revealed that, according to reports provided to them by K.C.B., Brice had slapped him and had instructed him to misbehave in school only during the time he was in Neal's possession.

---

[4]"The trial court may order reasonable possession of or access to a grandchild by a grandparent if:  . . . the grandparent requesting possession of or access to the child is a parent of a parent of the child and that parent of the child . . . has been incarcerated in jail or prison during the three-month period preceding the filing of the petition." TEX. FAM. CODE ANN. § 153.433(a)(3)(A) (West Supp. 2013).

The trial court heard from Brooks (K.C.B.'s counselor), Neal, and Friddle that K.C.B. had undergone a positive change since Brice was restrained from seeing him. Since moving to a "Triple A" school, K.C.B. was doing better, was making new friends, and was receiving the academic assistance he needed. Brooks testified that the child's anger issues were disappearing and that his living arrangement with Friddle, which allowed him to play with Friddle's five children, created a positive environment. We conclude that this evidence was legally sufficient to support the best-interest finding. *Giron*, 247 S.W.3d at 306.

Brice challenges Brooks' comments regarding her discipline by claiming that the reports of her slapping K.C.B. were unverified hearsay. Brice argues that her continued access to K.C.B. is in his best interest because he had lived with her for six years and because she facilitated his relationship with his father while Neal and Friddle did not. Brice contends that it is in fact Neal and Friddle who are alienating K.C.B. from his paternal family. In support of this contention, Brice points to testimony suggesting that Neal and Friddle were suspicious that K.C.B.'s father was involved in the fire that killed K.C.B.'s mother and highlights Neal and Friddle's letter-writing campaign to the Texas Board of Pardons and Paroles requesting that parole not be granted prior to the father's 2016 release date. Her arguments also reiterate that she was unaware that the tax refund and Social Security benefits checks belonging to K.C.B. were not to be cashed and used by her. Finally, Brice opines that "it is in the best interest of the child to have two loving grandparents." Brice's arguments raise credibility issues and questions of fact that the trial court was authorized to resolve.

14

"The Texas Family Code grants trial judges vast power and broad discretion over many important matters." *Moore v. Moore*, 383 S.W.3d 190, 194 (Tex. App.—Dallas 2012, pet. denied). We are mindful that "the trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *P.M.G.*, 405 S.W.3d at 410 (quoting *A.L.E.*, 279 S.W.3d at 427)). "We consider only the evidence most favorable to the trial court's ruling and will uphold its judgment on any legal theory supported by the evidence." *Id.* (citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)). "We, therefore, defer to the trial court's judgment in matters involving factual resolutions and any credibility determinations that may have affected those resolutions." *Id.* (citing *George v. Jeppeson*, 238 S.W.3d 463, 468 (Tex. App.—Houston [1st Dist.] 2007, no pet.)).

Considering the testimony of Brooks, Neal, and Friddle, along with evidence showing K.C.B.'s improvement since his separation from Brice and evidence establishing Brice's improper use of money belonging to K.C.B., we cannot say that the trial court's judgment was so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust, shocking to the conscience, or a clear demonstration of bias. *Cain*, 709 S.W.2d at 176.[5] Thus, we conclude that the trial court had a sufficient basis upon which to find that removing

---

[5]For the first time on appeal, Brice also argues that the court denied her due process "by chilling her constitutional right to appeal . . . by making it a part of her order that if Appellant was to appeal said order that . . . 'she would award Appellee $10,000.00 for appeal to this Court.'" At trial, W.T. Allison, III, counsel for Neal and Friddle, testified extensively about her fees, the rate which she charged per hour, the work that was done, and what the approximate cost for legal work on appeal would be. Although Brice filed a motion for new trial, she failed to raise any issue regarding due process or attorney's fees with the trial court. Thus, she failed to preserve these issues for our review.

Brice as K.C.B.'s conservator and denying Brice possession of or access to K.C.B. was in the child's best interest. The trial court's judgment was supported by factually sufficient evidence.

## III.    Conclusion

We affirm the trial court's judgment.

Jack Carter
Justice

Date Submitted:    January 3, 2014
Date Decided:      February 12, 2014

16